McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, New Jersey 07101-0652
(973) 622-4444

FISH & RICHARDSON P.C. (*pro hac vice*)
1717 Main Street, Suite 5000
Dallas, Texas 75201
 (214) 747-5070

Attorneys for Defendants,
CROSSMARK, Inc. and The Dannon Company, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **KATHLEEN JOHNSTON, LORETTA WEIGNER, and JANICE FAHRENHOLTZ, on behalf of themselves and all others similarly-situated,** | : : : : : | **Civil Action No. 08-1525 (SDW)** |
| **Plaintiffs,** | : : | **DECLARATION OF ELIZABETH BEDELL** |
| **v.** | : : | |
| **CROSSMARK, INC., and THE DANNON COMPANY, INC.,** | : : : | |
| **Defendants.** | : : | |

I, Elizabeth M. Bedell, declare as follows:

1.      I am a citizen of the United States, and an adult over the age of twenty-one (21)

years.  I have never been convicted of a felony or of a crime involving moral turpitude.  I make

this Declaration of my own personal knowledge, and could and would testify competently to the

matters set forth herein if called upon to do so.

2.      I am counsel for CROSSMARK, Inc. and The Dannon Company, Inc. in this

matter.

3.      The document attached as Exhibit "5" is a true and correct copy of the excerpts from the November 24, 2008 deposition of Plaintiff Kathleen Johnston that are cited in Defendants' Response in Opposition to Plaintiffs' Motion for Conditional Certification and Notice to Proposed Class.

4.      The document attached as Exhibit "6" is a true and correct copy of the excerpts from the November 24, 2008 deposition of Plaintiff Loretta Weigner that are cited in Defendants' Response in Opposition to Plaintiffs' Motion for Conditional Certification and Notice to Proposed Class.

5.      The document attached as Exhibit "7" is a true and correct copy of the excerpts from the December 11, 2008 deposition of James Postiglione that are cited in Defendants' Response in Opposition to Plaintiffs' Motion for Conditional Certification and Notice to Proposed Class.

6.      The document attached as Exhibit "8" is a true and correct copy of Defendants' Modified Notice.

7.      The document attached as Exhibit "9" is a true and correct copy of Defendants' proposed consent form.

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Dallas, Texas on this *11* day of December, 2008.

_____
Elizabeth M. Bedell

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

```
KATHLEEN JOHNSTON, LORETTA    )
WEIGNER and JANICE FAHRENHOLTZ,)
on behalf of themselves and   )
all others similarly situated, )
                              )
d            Plaintiffs,       )
                              )
            vs.               ) No. 08-1525
                              ) (SDW)
CROSSMARK, INC., and the      )
DANNON COMPANY,               )
                              )
            Defendants.       )
------------------------------)
```

DEPOSITION OF KATHLEEN JOHNSTON

Princeton, New Jersey

Monday, November 24, 2008

Reported by:
FRANCIS X. FREDERICK, CSR, RPR, RMR
JOB NO. 19835



EXHIBIT
tabbies
"5"

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 2

```
 1
 2
 3
 4
 5              November 24, 2008
 6              8:30 a.m.
 7
 8
 9       Deposition of KATHLEEN JOHNSTON,
10   held at the offices of Mason Griffin, 101
11   Poor Farm Road, Princeton, New Jersey,
12   pursuant to Notice, before Francis X.
13   Frederick, a Certified Shorthand
14   Reporter, Registered Merit Reporter and
15   Notary Public of the States of New York
16   and New Jersey.
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              PROCEEDINGS
 2       MR. FOX:  And before we start
 3   asking questions, Wayne, I just want to
 4   confirm that we're going to -- that the
 5   examination, while it might touch upon
 6   the fact that Ms. Johnston is no longer
 7   employed by or working for Crossmark,
 8   that we're not going to address today the
 9   retaliation claim that Ms. -- or claims
10   that Ms. Johnston has asserted against
11   Crossmark.
12       MR. BOZEMAN:  Correct.  And we've
13   agreed to -- that the deposition will be
14   limited to three hours or thereabouts and
15   that it will deal with the issues
16   surrounding conditional certification.
17       MR. FOX:  Yes.  That's agreed.
18       MR. BOZEMAN:  Okay.
19              * * *
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4   POWELL BOZEMAN
 5   Attorneys for Plaintiffs
 6       1900 Knight Circle
 7       Yardley, Pennsylvania  19067
 8   BY:  WAYNE D. BOZEMAN, ESQ.
 9       DR. RALPH A. POWELL, ESQ.
10
11   FISH & RICHARDSON, P.C.
12   Attorneys for Defendants
13       1717 Main Street, Suite 5000
14       Dallas, Texas  75201
15   BY:  STEPHEN E. FOX, ESQ.
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              K. JOHNSTON
 2   K A T H L E E N   J O H N S T O N,  called as
 3       a witness, having been duly sworn by a
 4       Notary Public, was examined and
 5       testified as follows:
 6   EXAMINATION BY
 7   MR. FOX:
 8       Q.   Would you please state your name?
 9       A.   Kathleen Marie Johnston.
10       Q.   Ms. Johnston, my name is Steve Fox
11   and I represent Crossmark, Inc. and Dannon
12   Corporation in a lawsuit that you've brought
13   against them.
14           Before we begin asking questions
15   about the substantive nature of the lawsuit,
16   let me ask you a couple of background
17   questions.  Have you ever been deposed before?
18       A.   No.
19       Q.   So that the process will go
20   smoothly between us let me see if we can have
21   some ground rules between the two of us.
22       A.   Okay.
23       Q.   First of all, will you permit me
24   to finish answering a question before we
25   begin -- will you agree to let me finish
```

2 (Pages 2 to 5)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 38

K. JOHNSTON

1
2  should be a class between January 2006 and
3  September 2008.
4        One more time.
5        The request is that a class be
6  certified for the time period January 2006 to
7  September 2008. I know that you left the
8  company in May of 2008.
9     A.   Um-hum.
10    Q.   Did you use SalesTrak to report
11 time worked between January 2006 and May of
12 2008?
13    A.   Of course.
14    Q.   You personally recorded or entered
15 the minutes that you worked in SalesTrak,
16 correct?
17    A.   Yes.
18    Q.   You didn't have somebody else do
19 it for you?
20    A.   No, no, no, no. I did it myself.
21    Q.   It was your responsibility, was it
22 not, to ensure that the time was entered
23 accurately in SalesTrak?
24    A.   Let me put it to you this way. I
25 entered it accurately. Where it went and how

Page 39

K. JOHNSTON

1
2  it went was on them.
3     Q.   But we can agree, can we not, that
4  you understood it was your responsibility to
5  accurately enter time in SalesTrak?
6     A.   Correct. Right. And I believe I
7  did to the best of my ability.
8     Q.   During this same time period,
9  January 2006 to May of 2008, Crossmark used a
10 software program called Lawson to pay retail
11 representatives, correct?
12    A.   I guess. I don't know how they do
13 payroll but that's what we used, yes.
14    Q.   You've heard the term Lawson?
15    A.   Yes.
16    Q.   What did you understand this
17 Lawson program to do or be?
18    A.   You know what? I didn't give any
19 thought to it. I'm not a computer programmer.
20 I was given very little training. I did what
21 I was supposed to do on my part. How it
22 works, I'm not supposed to -- I don't know.
23    Q.   Okay. Did you understand while
24 you worked for Crossmark between January of
25 2006 and May of 2008 that Lawson would take

Page 40

K. JOHNSTON

1
2  minutes that you recorded in SalesTrak and
3  convert those minutes to hours worked?
4     A.   Like I said, I did the principles,
5  the basic principles. How it exactly works, I
6  don't know.
7     Q.   Okay. We're on the same page.
8  I'm not asking you how the logarithms -- the
9  algorithm worked; just that you understood
10 that Lawson did some conversion from the
11 SalesTrak information.
12    A.   Right. But, like, you know, being
13 an honest person you expect to be paid exactly
14 to the minute so I trusted them to pay us
15 exactly to the minute.
16    Q.   So if you entered 90 minutes of
17 work time in SalesTrak that time should be
18 converted into 1.5 hours in Lawson, correct?
19    A.   Again, I don't know how it works.
20    Q.   Can you describe the computer
21 error that you claim resulted in pay shortages
22 for you and the proposed class members?
23    A.   I don't know anything about a
24 computer error other than my paycheck was
25 always shorted five minutes. You're asking me

Page 41

K. JOHNSTON

1
2  how it works. I don't know how the Lawson
3  works.
4     Q.   If you understood my question to
5  be that then I apologize because I'm not
6  actually asking you to help me understand how
7  the conversion process worked.
8        I just want to know from you what
9  do you believe occurred with respect to this
10 alleged computer error.
11    A.   What do I believe occurred?
12    Q.   Yes, ma'am.
13    A.   I believe they would always round
14 you down to save money. It was done on
15 purpose. That's what I believe.
16    Q.   Is it your testimony for every
17 week that you entered time into SalesTrak that
18 you were shorted pay?
19    A.   Yes.
20    Q.   So your contention is that this
21 computer problem always benefited Crossmark.
22    A.   Yes.
23    Q.   Have you ever reviewed or compared
24 your own SalesTrak report and your Lawson
25 payroll record to determine that the computer

Page 50

K. JOHNSTON

1
2    A.   Oh, I see where you're going.  No.
3  Just to be at the meeting.
4    Q.   Okay.
5    A.   Um-hum.
6    Q.   So you don't perform services for
7  Crossmark -- you never performed services for
8  Crossmark in states other than Pennsylvania
9  and New Jersey.
10   A.   Correct.
11   Q.   Do you and every retail
12  representative that you seek to represent in
13  this lawsuit perform exactly the same duties
14  on a daily basis?
15   A.   No.  You know why?  Could I
16  explain that?
17   Q.   Yes, ma'am.
18   A.   Everybody does things differently.
19  I might check my voice mails ten times a day.
20  Somebody else might check them two times a
21  day.  Basically the job is the same.  But
22  people do it differently.
23   Q.   Now, are you saying that people
24  who work, for instance -- let me start over
25  again.

Page 51

K. JOHNSTON

1
2    Are you saying retail
3  representatives who work for Crossmark in, for
4  instance, California and Texas perform exactly
5  the same retail representative
6  responsibilities that you perform in
7  Pennsylvania and New Jersey?
8    A.   Oh, I'm sorry.  I thought we were
9  just talking about the Dannon team.
10   Q.   I'm sorry.  That was my mistake.
11  So let me try to explain it further or ask it
12  better.
13       Do you know what responsibilities
14  are performed by Crossmark retail
15  representatives who do not work on the Dannon
16  dedicated team?
17   A.   No.
18   Q.   Do you know what hours are worked
19  by Crossmark retail representatives who do not
20  work on the Dannon dedicated team?
21   A.   No.
22   Q.   Do you know what hours retail
23  representatives who were not on the Dannon
24  dedicated team, what hours they worked between
25  January 2006 and May of 2008?

Page 52

K. JOHNSTON

1
2    A.   No.
3    Q.   Let me go back to the
4  responsibilities question.
5    A.   Um-hum.
6    Q.   Between January 2006 and May of
7  2008, do you know what job responsibilities
8  were performed by Crossmark retail
9  representatives who did not work on the Dannon
10  dedicated team?
11   A.   No.
12   Q.   Do you know whether this computer
13  rounding error, to call it that, was
14  experienced by Crossmark retail
15  representatives who did not work on the Dannon
16  dedicated team?
17   A.   Okay.  I know nothing about other
18  teams.
19   Q.   Retail representatives on the
20  Dannon dedicated team used hand-held devices
21  to perform certain administrative functions,
22  correct?
23   A.   Yes.
24   Q.   To what extent do retail
25  representatives who are not Dannon team

Page 53

K. JOHNSTON

1
2  members use hand-held devices, if at all?
3    A.   As I said, I don't know what other
4  divisions, what they do.  Also depends on
5  supervisors, too.  What's expected of them.
6    Q.   Did you ever ask or talk to anyone
7  at Crossmark about this alleged computer time
8  keeping problem?
9    A.   Other than that POD meeting where
10  they were talking, no.
11   Q.   Did you ever speak to a supervisor
12  or manager at Crossmark about this alleged
13  computer time keeping problem?
14   A.   Yes.
15   Q.   Who?
16   A.   I talked to Izabela about it.
17   Q.   Tell me about that conversation.
18  How did it come up and what did you say and
19  what did she say?
20   A.   Izabela was a lovely woman but she
21  knew nothing about anything.  I mean, she
22  would just kind of laugh at you and brush you
23  off and be like, Um-hum, I don't know, you
24  know.  Why are we getting shorted.  I don't
25  know.

14  (Pages 50 to 53)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 54

1              K. JOHNSTON
2         Probably the most reliable was the
3    e-mail from Dwayne Hamilton saying that it was
4    a computer error.  That was pretty much black
5    and white.  It said what the cause of it was.
6    So...
7         Q.    So let me go back to your
8    conversation with Izabela.
9         A.    Um-hum.
10        Q.    Did you ask her about this alleged
11   computer time keeping error?
12        A.    Yes.
13        Q.    What did you ask her?
14        A.    I asked her why we're getting
15   shorted five minutes, you know, in the
16   paycheck.  And she just had no answer.
17        Q.    When did you ask her that?
18        A.    When?
19        Q.    Yes, ma'am.
20        A.    I don't remember when.  At some
21   point.  She wasn't with us very long.
22        Q.    And how did she respond to your
23   question?
24        A.    Ridiculously.  She giggled.  Like
25   she did most of the time when you asked her

Page 55

1              K. JOHNSTON
2    something.
3         Q.    Did she tell you she wasn't aware
4    of any error?
5         A.    Yes.
6         Q.    Other than talking to Izabela, did
7    you talk to any other Crossmark manager or
8    supervisor about the alleged computer time
9    keeping problem?
10        A.    Not to my knowledge, no.  I didn't
11   really have contact with anybody.  I only saw
12   Betty maybe once a year, twice a year.
13        Q.    Separating this e-mail that you've
14   mentioned a couple of times from Dwayne
15   Hamilton, what other personal knowledge do you
16   have that Crossmark knew about the alleged
17   computer time keeping problem prior to the
18   filing of your lawsuit?
19        A.    Run that past me one more time,
20   please.
21        Q.    Yes, ma'am.  I'm putting aside the
22   Dwayne Hamilton e-mail that you mentioned.
23        A.    Right.  I got that.
24        Q.    What personal knowledge do you
25   have that Crossmark knew about the alleged

Page 56

1              K. JOHNSTON
2    computer time keeping problem prior to the
3    filing of your lawsuit?
4         A.    I have no knowledge.  Other than
5    that e-mail which said it in black and white.
6         Q.    When that e-mail --
7              MR. FOX:  It's been produced in
8    the lawsuit, right?
9              MR. BOZEMAN:  Yeah.
10             MR. FOX:  Okay.  I think I know
11   the one we're talking about.
12             MR. POWELL:  It was forwarded,
13   forwarded, and then it was there so it
14   wouldn't be at the top of the e-mail.  It
15   was forwarded by several employees to us.
16             MR. FOX:  Okay.
17   BY MR. FOX:
18        Q.    So let's move on and discuss your
19   allegations about unpaid administrative time.
20        A.    Okay.
21        Q.    Can you describe for me the
22   administrative tasks that you performed at the
23   beginning of each workday during your
24   employment with Crossmark.
25        A.    Okay.  Basically you would have to

Page 57

1              K. JOHNSTON
2    synch the scanner in the morning.  Check
3    e-mails, voice mails, before you got to your
4    first store.
5         Q.    Anything else?
6         A.    No.  That's pretty much it.
7    Assuming you synch right.
8         Q.    Could you dis -- well, how long
9    did it take you to synch the scanner?
10        A.    They had a lot of problems with it
11   so it could take anywhere from five minutes to
12   not working at all.
13        Q.    But when it worked --
14        A.    On a good day --
15        Q.    It took five minutes?
16        A.    -- five reasons ten minutes, yeah.
17        Q.    Okay.
18        A.    On a bad day, like I said, you
19   could sit there for hours and it wouldn't
20   synch.
21        Q.    You didn't sit there for hours and
22   let it synch, did you?
23        A.    Usually I gave up.  See, the first
24   hour's on us at the store.  I liked to have
25   started at 7:00.  Every day 7:00 I was in my

Page 66

K. JOHNSTON

2 that you spend performing administrative
3 tasks?
4      A.   Verbally they always said no
5 overtime.  But then they'd ask you to do
6 things that they knew were going to take
7 longer so...
8      Q.   Did anybody tell you that you were
9 not to accurately record the time that you
10 spent performing administrative tasks at the
11 beginning of your workday and at the end of
12 your workday?
13      A.   Run that past me one more time.  I
14 just want to make sure I heard it the way I
15 heard it.
16      Q.   Did anybody at Crossmark tell you
17 that you were not to accurately record the
18 time you spent performing administrative tasks
19 at the beginning of your workday and at the
20 end of your work day?
21      A.   Let me put it to you this way.  It
22 was never put to you don't do it but it was
23 very much insinuated that you got 30 minutes a
24 day and that's all it better take.
25      Q.   Did you --

Page 67

K. JOHNSTON

2      A.   Now a lot of -- go ahead.
3      Q.   Did you ever report more than --
4 did anybody ever complain to you about your
5 recording of administrative tasks at the
6 beginning of the workday or the end of the
7 workday?
8      A.   Me, personally, no.  Because I
9 always stayed within what they asked me to do
10 and I just worked the extra on myself and just
11 didn't get paid for it.  You know what I'm
12 saying?
13      Q.   How is it that you had this
14 understanding that you were supposed to report
15 only 30 minutes a day in administrative time
16 for administrative tasks performed at the
17 beginning and end of the workday?
18      A.   It was verbally told to us on a
19 meeting.
20      Q.   Who said that?
21      A.   Christian Garcia.  And then it was
22 understood that if your packet came in with
23 the retail ready book and your were to do that
24 you could pretty much take 90 minutes and then
25 you could pretty much take extra time on a

Page 68

K. JOHNSTON

2 Friday also.  I believe that was 90 minutes on
3 Friday total.
4           See, I don't know.  They would
5 tell you one thing.  Then the next meeting
6 they might tell you the week before, okay,
7 take 90 minutes on a Friday.  The next meeting
8 they might say, you know what, take 60 minutes
9 on a Friday.  They would never give you
10 anything in writing which would have been
11 helpful because then you could have followed
12 that in black white instead of like he said
13 this, now he's saying this.
14      Q.   Now, you said a couple of times in
15 that answer that "they" said this and "they"
16 said that.  Who's "they"?
17      A.   Christian Garcia and sometimes
18 etty Beatie.  Like, they would contradict
19 each other.  One time Betty would tell you
20 something or on the same conference call
21 Izabela would say something that would
22 contradict Betty.
23      Q.   Well, what we're focusing on right
24 now is the recording of the time for
25 performing administrative tasks.

Page 69

K. JOHNSTON

2      A.   Right.  I was always told 30
3 minutes.
4      Q.   Who told you that?
5      A.   Christian Garcia.  He was the man
6 who hired me.
7      Q.   Mr. Garcia worked on the Dannon
8 dedicated team, correct?
9      A.   Yes.  He was the supervisor.
10      Q.   Did anybody else besides Mr.
11 Garcia allegedly tell you that you were only
12 to report -- well, let me start over again.
13           Did you ever ask anybody at
14 Crossmark -- let me rephrase it one more time.
15           Did you ever tell anybody at
16 Crossmark that you were spending more than 30
17 minutes a day performing administrative tasks
18 at the beginning of the workday and at the end
19 of the workday?
20      A.   Yes.
21      Q.   Who?
22      A.   I would complain to anybody who
23 would listen.
24      Q.   Who?
25      A.   I mentioned it to Izabela that you

18  (Pages 66 to 69)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 70

1              K. JOHNSTON
2  could not possibly get the work done in all
3  the time. I mentioned it to Dan on the Dannon
4  team I believe.
5      Q.   What's Dan's last name?
6      A.   I don't remember.
7          THE WITNESS: Do you remember?
8          MR. POWELL: Dan...
9      Q.   Is he a Dannon employee or a
10  Crossmark employee?
11     A.   No. He's Dannon.
12         Christian Garcia when I first
13  started I mentioned. I've mentioned it to
14  other sales reps. Like questions. Like does
15  this take you so long. This is taking me
16  forever. And, you know, that type of thing.
17  Mostly supervisors, though, because I rely on
18  their professional opinion how to get the job
19  done more efficiently in less time.
20     Q.   When did Mr. Garcia allegedly tell
21  you that you were not to record all -- or you
22  couldn't record more than 30 minutes a day --
23     A.   On one of the conference calls.
24     Q.   When?
25     A.   I have no clue. On one of them at

Page 71

1              K. JOHNSTON
2  some point.
3      Q.   And what did he say on this
4  conference call?
5      A.   Dannon would like us to take 30
6  minutes. Total admin time.
7      Q.   Do you have any proof that Mr.
8  Garcia made that statement to anybody other
9  than retail representatives who were working
10  on the Dannon dedicated team?
11     A.   Do I have any proof that he said
12  it?
13     Q.   To people who were not on the
14  Dannon dedicated team.
15     A.   No.
16     Q.   Do you have any proof that
17  supervisors other than Mr. Garcia made similar
18  statements to their employees?
19     A.   No.
20         MR. BOZEMAN: Counsel, do you
21  think we could take just a short break?
22  Five minutes?
23         MR. FOX: Can I get through this
24  exhibit, Wayne, and then we will actually
25  be off this topic and then we can take a

Page 72

1              K. JOHNSTON
2  break and move on to something else.
3          MR. BOZEMAN: You can. Sure.
4          (Defendant's Exhibit 2, document
5  entitled SalesTrak Web View Payroll
6  Solution Training Dedicated Teams, marked
7  for identification as of this date.)
8  BY MR. FOX:
9      Q.   Ms. Johnston, I've handed you what
10  we've marked as Exhibit 2.
11     A.   Um-hum.
12     Q.   Is this a -- it appears to be a
13  Powerpoint presentation called SalesTrak Web
14  View Payroll Solution Training Dedicated
15  Teams.
16         Do you see that?
17         I'm looking at the first page.
18     A.   Okay.
19     Q.   Have you -- let me give you as
20  much time as you need, 30 seconds, you want a
21  couple minutes to look at this. Have you seen
22  this document before today?
23         (Document review.)
24     A.   This might have been something
25  that they gave us with the five minutes of

Page 73

1              K. JOHNSTON
2  training with the scanner.
3      Q.   Well, do you recall when you first
4  began using SalesTrak and the scanner that
5  there was a presentation about how to use the
6  scanner and how to use SalesTrak?
7      A.   There was about a half an hour,
8  maybe -- I'll give them the benefit of the
9  doubt -- maybe hour training course. And we
10  couldn't even use the syncher because it
11  wasn't hooked up. They had one like on the --
12  above like the projector.
13     Q.   Yes, ma'am.
14     A.   The training was very inaccurate.
15  It didn't seem like any of the supervisors
16  knew how to use the scanner.
17     Q.   You know what? I want to separate
18  the scanner training from the use of SalesTrak
19  training because I think this presentation
20  just focuses on the use of SalesTrak.
21     A.   Oh, okay.
22     Q.   Do you recall being trained about
23  how to use SalesTrak?
24     A.   No. When I was first hired,
25  Christian -- I met him at the office in Exton

19 (Pages 70 to 73)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 78

K. JOHNSTON
1
2      A.   But I believe it was on the 27th.
3      Q.   Okay.
4           MR. BOZEMAN:  28th.
5           THE WITNESS:  28th?
6      Q.   So it was the 28th?
7      A.   You know what?  It was a hard day.
8      Q.   Okay.
9      A.   I was shocked.
10          MR. FOX:  Well, let me put that
11     aside and we'll leave that for later.
12     Q.   Do you have any personal knowledge
13     that any retail representatives on teams other
14     than the Dannon dedicated team were not
15     recording administrative time that exceeded 30
16     minutes at the beginning and end of the
17     workday?
18     A.   I could only speak for myself.  I
19     have no knowledge of what everybody else does.
20     Q.   Let me ask you even more
21     specifically and about the Dannon dedicated
22     team.
23     A.   Okay.
24     Q.   Do you have any personal knowledge
25     that retail representatives who served on the

Page 79

K. JOHNSTON
1
2      Dannon dedicated team were not following
3      Crossmark's policy of reporting all
4      administrative time?
5      A.   So basically you're asking me if
6      reps told me that they spent more time working
7      than they reported; is that what you're asking
8      me?
9      Q.   Let's break it up.  We'll answer
10     that question -- let's go with that question
11     first.
12          What retail representatives told
13     you that they were not recording all of the
14     administrative time that they worked at the
15     beginning or end of the workday?
16     A.   Well, I would say Lori has told me
17     she's put in extra time.  Cathy Lombardi.
18     Janice.  Don't ask me what her last name is.
19     Q.   Janice Fahrenholtz?
20     A.   Yeah.  She mostly had problems
21     with the scanner and calling into the help
22     desk.  Other reps that I have heard complain
23     at POD meetings like, Oh, I'm doing this, I'm
24     doing that, so much extra printing time.  But
25     I couldn't give you names.

Page 80

K. JOHNSTON
1
2      Q.   Do you know whether -- other than
3      the communication that you had with Mr. Garcia
4      in which he said that Dannon wanted to keep
5      administrative time to 30 minutes, do you know
6      who else he allegedly made that statement to
7      on the Dannon dedicated team?
8      A.   Well, it was on a business meeting
9      call.
10     Q.   So who was on that call besides
11     you and Mr. Garcia?
12     A.   Should be the whole team.
13     Q.   Who was part of the team at the
14     time?
15     A.   Al Gallion, Lori, Cathy Lombardi,
16     Lisa -- oh, I don't know her last name.  No, I
17     don't know if Lisa was there.  She might have
18     started after that.  I don't know.  Whoever
19     was on the Dannon team at the time.
20     Q.   But you can't identify those
21     people right now.
22     A.   Just the ones that I did.
23     Q.   Al, Lori and Cathy are the only
24     ones that you've identified.
25     A.   Oh, Janice.  She's been with the

Page 81

K. JOHNSTON
1
2      team a long time.  There was a Lisa that was
3      on our team for a while.  Rose.  Oh, what's
4      that man's name?  The other one.  A very nice
5      man.  I can see his face but I'm not sure of
6      his name.
7      Q.   Have you ever spoken to any retail
8      representatives who were not on the Dannon
9      dedicated team about whether they report time
10     spent on administrative tasks at the beginning
11     and end of the workday?
12     A.   No.
13     Q.   Have you ever spoken to any retail
14     representatives who were not on the Dannon
15     dedicated team about whether they actually
16     report all time spent on administrative tasks
17     at the beginning and end of the workday?
18     A.   No.
19     Q.   So the allegation that you
20     asserted against Crossmark about not paying
21     you for performing administrative tasks at the
22     beginning and end of each workday is unique to
23     you and to the people who worked on the Dannon
24     dedicated team, correct?
25     A.   I wouldn't say that.  I don't

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 82

1              K. JOHNSTON
2    know.  I would assume that everybody that was
3    full time was getting -- I don't want to say
4    ripped off five minutes.  I don't know a nice
5    way to put it.
6         Q.   I'm talking about the
7    administrative task recording.  What proof do
8    you have --
9         A.   Oh, what proof.
10         Q.   What proof do you have that
11    persons who did not work on the Dannon
12    dedicated team --
13         A.   None.
14         Q.   -- were instructed not to record
15    administrative time exceeding 30 minutes?
16         A.   Right.  I don't.
17         Q.   Did you ever ask anybody at
18    Crossmark about what Crossmark's policy was
19    with respect to accurately recording all time
20    that you spent performing administrative
21    tasks?
22         A.   Of course.  A supervisor.
23    Christian.  And Izabela.
24         Q.   And I'm not trying to quibble with
25    words but I am trying to be a little bit

Page 83

1              K. JOHNSTON
2    careful with my words.
3         A.   Okay.
4         Q.   You told me that he said that
5    Dannon didn't really want people recording
6    more than 30 minutes in administrative time
7    during each workday, correct?
8         A.   They liked -- he said Dannon would
9    like us to stick within the 30 minutes, yes.
10         Q.   Okay.  Did anybody say but what if
11    it takes longer?
12         A.   Yes.
13         Q.   Who?
14         A.   Oh, I don't know.  I just heard a
15    voice on the other end of the phone in the
16    meeting.
17         Q.   And did Mr. Garcia respond if it
18    takes longer you have to record it accurately
19    because that's our policy?
20         A.   I've never heard that from anybody
21    that worked in that company.  Sorry.
22         Q.   All right.  If somebody actually
23    said that then, during the conversation, that
24    is that what happens if it takes you longer
25    than 30 minutes, what was the response?

Page 84

1              K. JOHNSTON
2         A.   No response.  None to my knowledge
3    that I remember.
4         Q.   Okay.
5              MR. FOX:  Why don't we take a
6    five-minute break.
7              (Recess taken.)
8    BY MR. FOX:
9         Q.   Let's pick up where we were.
10              Did you ever record administrative
11    time exceeding 30 minutes for the tasks that
12    you performed at the beginning of the workday
13    ask at the end of the workday?
14         A.   The only time when it was okayed
15    by them to put down extra time.  The
16    supervisors.
17         Q.   Okay.  On what occasions was it
18    okayed by the supervisors -- given that the
19    policy said you're supposed to record all
20    administrative time, but putting that aside,
21    to what extent did they okay you to put down
22    more than 30 minutes administrative time?
23         A.   I believe maybe twice the whole
24    time I was working full time for overtime due
25    to a mapping project.

Page 85

1              K. JOHNSTON
2         Q.   Now, let me make sure if I get --
3    let me make sure I'm getting this clearly from
4    you.
5              Nobody ever told you that you
6    could not report more than 30 minutes
7    administrative time for tasks performed at the
8    beginning and at the end of the workday,
9    correct?
10         A.   No.  You couldn't because that
11    would kick you into overtime.  So you could
12    not report your accurate time.
13         Q.   Let me make sure I got this right.
14              You told us earlier that Mr.
15    Garcia said that Dannon would like, and I put
16    that in capitals and highlight, would like the
17    representatives to keep the administrative
18    time to 30 minutes.
19         A.   Right.
20         Q.   My question is a little different
21    now.
22         A.   Okay.
23         Q.   You were never told that you could
24    not write down more than 30 minutes of
25    administrative time for tasks spent at the

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 90

K. JOHNSTON

1
2     Q.   On average how long did it take
3 you to drive from your home to your first work
4 location at the beginning of the workday?
5     A.   Well, that depended.  I had some
6 stores that were five minutes away.  And I had
7 other stores that were an hour away or more.
8 When I did the South Jersey route that was
9 longer.
10     Q.   So it varied depending upon your
11 territory.
12     A.   Right.
13     Q.   And the stores that you were
14 assigned at that -- any given time.
15     A.   Right.  What they wanted us to do
16 and encouraged us to do was to do a local
17 store first, say -- I'm sorry.  A further away
18 store first.  So, in other words, they would
19 encourage me to go to Quakertown and work my
20 way back as opposed to going to say, Fairless
21 Hills which is five minutes away and clocking
22 from there.
23     Q.   If it took you longer than one
24 hour to drive from your home to your first
25 work location Crossmark compensated you for

Page 91

K. JOHNSTON

1
2 the time spent driving that exceeded one hour,
3 correct?
4     A.   Correct.
5     Q.   So when you reported your time
6 worked in SalesTrak you would record any drive
7 time that exceeded one hour if it was this --
8 and if that hour -- let me start over again.
9         When you recorded time in
10 SalesTrak you would record drive time that
11 exceeded one hour at the beginning of the
12 workday as drive time, correct?
13     A.   Right.
14     Q.   Now, you are seeking to represent
15 a class of retail representatives from across
16 the country who worked for or who still work
17 for Crossmark between January 2006 and
18 September 2008.
19         What proof do you have that it
20 took all of the retail representatives that
21 you are seeking to represent in this
22 collective action the same amount of time to
23 drive from their home to their first work
24 location at the beginning of the workday?
25     A.   Again, I'm only speaking for

Page 92

K. JOHNSTON

1
2 myself.  By seeking -- this is kind of
3 throwing me off a little bit about me seeking
4 to prove what it is at other divisions.  When
5 I started this, it was for myself.  I'm only
6 speaking for myself.
7     Q.   So you don't have any proof
8 about -- or you don't have any knowledge of
9 what retail representatives, for instance, in
10 California or Texas, how long --
11     A.   Other than the Dannon team --
12     Q.   Hang on.  Let me finish my
13 question.
14         The knowledge you have is Dannon
15 dedicated team focused, correct?
16     A.   Correct.
17     Q.   It's only what happened with the
18 Dannon dedicated team, correct?
19     A.   Correct.
20     Q.   All right.  Now, do you have any
21 knowledge of the drive time efforts that
22 retail representatives outside of the Dannon
23 dedicated team had to undertake?
24     A.   No.  But the fact that the Dannon
25 dedicated team is in other states like DC,

Page 93

K. JOHNSTON

1
2 Virginia, they had told me a little bit about
3 their schedules and how it was extra driving
4 time.
5     Q.   Who told you that?
6     A.   Rose lives further.  Lisa who's no
7 longer with the company.  There's another rep
8 that -- her territory is very, very country.
9 She actually stays overnights but I don't know
10 her name.
11     Q.   What did Rose tell you about
12 driving time?
13     A.   Well, just that there's a lot of
14 drive time involved at times.  You know, to
15 get from one store to another.
16     Q.   What did Lisa tell you about drive
17 time?
18     A.   The same thing.  That there was
19 times it just took longer or you run
20 into traffic.
21     Q.   Both Rose and Lisa work on the
22 Dannon dedicated team?
23     A.   No.  Lisa's no longer with the
24 dedicated team.
25     Q.   Did both Rose and Lisa work on the

24  (Pages 90 to 93)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 94

K. JOHNSTON

1                    K. JOHNSTON
2    Dannon dedicated team?
3        A.   Rose is still with them but Lisa
4    is gone.
5        Q.   But Lisa used to work on the
6    Dannon dedicated team?
7        A.   Yes, yes.
8        Q.   In performing your job duties as a
9    retail representative was it your practice to
10   stay at the same work location throughout the
11   day?
12       A.   No.  We had to move around.
13       Q.   So you typically traveled to a
14   different work location during the same day?
15       A.   Correct.
16       Q.   Are you claiming that Crossmark
17   failed to compensate you for the time spent
18   driving to a second, third or more work
19   location after you arrived for work at your
20   first location?
21       A.   No.  From store to store they
22   would cover that.
23       Q.   Okay.  When you reported your time
24   worked in SalesTrak, you would record the time
25   spent driving between work locations as drive

Page 95

1                    K. JOHNSTON
2    time, correct?
3        A.   I'm sorry.  Run that past me
4    again.
5        Q.   When you reported your time in
6    SalesTrak, you recorded the time that you
7    spent driving between work locations; that is,
8    after you arrived at the first location.
9        A.   Right.  And anything extra to the
10   first store.  Say, if it was over an hour.
11       Q.   So let's break that down.  If it
12   was more than an hour you recorded -- if it
13   took you longer than one hour to drive to your
14   first work location, then you recorded into
15   SalesTrak as drive time the amount of time
16   that exceeded the hour.
17       A.   Right.  Like when I did West Long
18   Branch it took me an hour and a half.  So the
19   last half hour I would add towards the
20   store-to-store.
21       Q.   All right.  And then when you
22   drove between work locations during the
23   workday, that is after you arrived at the
24   first work location, you would record the
25   drive time between different work locations as

Page 96

1                    K. JOHNSTON
2    drive time.
3        A.   Correct.  And anything extra like
4    that extra half an hour, yes.
5        Q.   Yes, ma'am.  And at the end of the
6    workday when you returned home from your final
7    work location, if it exceeded an hour, you
8    would record whatever exceeded as drive time.
9        A.   Yes.
10       Q.   So on average can you give me an
11   estimate of the amount of time that it took
12   you to drive to your first work location at
13   the beginning of the workday?
14       A.   Again, I can't.  It would vary.
15       Q.   What about at the end of the
16   workday; can you give me an average of the
17   amount of time that it took you to drive from
18   your last work location to your home?
19       A.   Again, it would depend.  I always
20   tried to work the furthest and then work my
21   way back home.  So sometimes that would be
22   five minutes from my house.  Sometimes it
23   might be a half an hour from my house.
24   Depending on, you know, what my route was that
25   day.

Page 97

1                    K. JOHNSTON
2            (Defendant's Exhibit 4, document
3        entitled Crossmark Full-time Associate
4        Policy Manual May 2004, marked for
5        identification as of this date.)
6            (Defendant's Exhibit 5, Employment
7        Acknowledgement bearing production number
8        CMK 000397, marked for identification as
9        of this date.)
10           (Defendant's Exhibit 6, Drive Time
11       and Business Mileage Reimbursement Policy
12       bearing production numbers CMK 000317
13       through CMK 000320, marked for
14       identification as of this date.)
15   BY MR. FOX:
16       Q.   Okay.  Ms. Johnston, I've handed
17   you what we've marked as Exhibit 4 which is
18   entitled Crossmark Full-Time Associate Policy
19   Manual, May 2004.
20           Do you see that?
21       A.   Correct.
22       Q.   Do you recall receiving a copy of
23   this manual during your employment with
24   Crossmark?
25       A.   Well, I didn't get a chance to

                                25 (Pages 94 to 97)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 102

K. JOHNSTON
1
2 the time that you spent commuting from your
3 home to your first work location and then
4 commuting by returning home from your last
5 work location?
6    A.   In my mind, and this is just my
7 opinion, if I'm getting up on my time early
8 and synching the computer, I don't understand
9 why the day doesn't start the minute I synch
10 their scanner in. A lot of times, like I told
11 you, it didn't work right and it would put me
12 behind in traffic to get to my first location.
13 And that's the point I brought up to Izabela.
14 I'm, like, I don't understand this. I mean,
15 I'm up -- I'm already working. I'm already
16 checking e-mails before I even get to the
17 first store. How is that not considered
18 working and why isn't that paid for?
19    Q.   Now, you say you spoke to Izabela.
20    A.   Yes. At some point.
21    Q.   When did you talk to Izabela about
22 drive time?
23    A.   At some point when she was the
24 supervisor.
25    Q.   Did you ever speak to Mr. Garcia

Page 103

K. JOHNSTON
1
2 about drive time pay?
3    A.   Yes, I did. Because when my route
4 changed and I was going very far I couldn't
5 understand why they didn't have me a little
6 bit closer stores.
7    Q.   Did you ever talk to Mr. Garcia
8 about being paid for your drive time; not just
9 that it took you longer to drive to your first
10 location, or the territory was larger, but
11 rather did you raise with him the issue of
12 drive time pay?
13    A.   Christian was very fair. I didn't
14 really need to talk to Christian too much
15 because Christian would give me good
16 direction. I'll put it to you that way.
17    Q.   So the answer to my question is
18 no, you did not talk to him about drive time
19 pay?
20    A.   I'm sure I did at some point if I
21 needed to. But not to my knowledge that I can
22 remember.
23    Q.   Did you ever talk to Betty Beatie
24 about drive time pay?
25    A.   Had very little contact with Betty

Page 104

K. JOHNSTON
1
2 Beatie, no.
3    Q.   So tell me about this conversation
4 that you had with Izabela about drive time
5 pay?
6    A.   I don't really recall it.
7    Q.   Your claim was that you began your
8 workday when you began synching and so you
9 thought that the workday should continue all
10 the way through your arrival at the first work
11 location and, therefore, you should be paid
12 for your driving.
13    A.   Right.
14    Q.   What did she say to you when you
15 raised that?
16    A.   She giggled.
17    Q.   Did you ask her to follow up with
18 any other manager or supervisor at Crossmark?
19    A.   Never heard from her --
20    Q.   Did you ask her to follow up?
21    A.   Yes, I did. But I never heard
22 from her.
23    Q.   Did you ever follow up with her?
24    A.   You know, after a while she was so
25 experienced we just stopped asking questions.

Page 105

K. JOHNSTON
1
2 I know I stopped asking questions.
3    Q.   Crossmark did not control the
4 activities that you engaged in during your
5 commute, did it?
6    A.   I'm sorry. Run that past me one
7 more time.
8    Q.   Did Crossmark control the
9 activities that you engaged in during the
10 commute?
11    A.   Before or after the scanner or
12 both?
13    Q.   You've gotten into your car,
14 you're now driving to your first work
15 location.
16    A.   Right.
17    Q.   Crossmark doesn't control what you
18 do in the car while you drive to that first
19 work location, does it? Or did it?
20    A.   No. I would say no. Other than
21 the fact that they know what time you get
22 where you're going.
23    Q.   You were not required by Crossmark
24 to participate in conference calls during your
25 commute, were you?

27 (Pages 102 to 105)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 106

K. JOHNSTON

1
2     A.   Well, you're not supposed to be on
3  the phone at all in the company car when
4  you're driving.  But, yes, they did delay us
5  sometimes from commuting because there would
6  be a conference call at 8:00 or 9:00.
7     Q.   Maybe my question wasn't entirely
8  clear and I can certainly understand that
9  that's possible.
10         Did you participate in conference
11 calls while driving?
12    A.   No.  I pulled aside.
13    Q.   Did you -- were you required by
14 Crossmark -- well, let me start that over
15 again.
16         With respect to this idea of
17 pulling over.  If you participated in a
18 conference call during the commute but while
19 you pulled over on the side of the road, you
20 recorded that as administrative time, didn't
21 you?
22    A.   Oh, I see what you're saying.
23 Yes.  Yes.
24    Q.   All right.  So let me go back to
25 the commuting exercise.  You weren't required

Page 107

K. JOHNSTON

1
2  by Crossmark to complete any paperwork while
3  you were commuting from your home to your
4  first work location, were you?
5     A.   Other than pulling over and doing
6  the meeting -- because there was paperwork
7  required with that.  You'd have to pull over
8  and say, well, did you bring that document.
9     Q.   Okay.
10    A.   I mean, obviously you can't look
11 at paperwork while you're driving.
12    Q.   Right.  That's part of my point.
13 Right.
14         Right.  So did you ever complete
15 paperwork while you were driving?
16    A.   No.
17    Q.   If you pulled over to participate
18 in a conference call and completed paperwork
19 during that conference call you recorded that
20 time as administrative time, didn't you?
21    A.   Actually that wasn't
22 administrative time.  That was put on
23 something else because -- that training.  That
24 was put under training.
25    Q.   So it was recorded into SalesTrak

Page 108

K. JOHNSTON

1
2  then.
3     A.   Yes.  And they told you how much
4  time to put in and a lot of times we would
5  shorted time there because, say, your
6  conference call was at 8:00.  You might want
7  to call in five of eight to make sure you have
8  the right number.  They would always kind of
9  gyp you a couple of minutes.  I don't like to
10 use the word gyp.  But they would tell you --
11 they would short you a couple of minutes on
12 conference calls also.
13    Q.   Now, that's different from this
14 idea of drive time, right?
15    A.   That's different from drive time.
16 Like I said, that went under training.
17    Q.   You weren't required while driving
18 to synch your hand-held device, correct?
19    A.   Well, you couldn't anyway.  You
20 needed a computer.
21    Q.   So you weren't required to synch
22 the hand-held device while driving, were you?
23    A.   No.
24    Q.   Were you required to perform any
25 duties while you were actually driving?

Page 109

K. JOHNSTON

1
2     A.   No.
3     Q.   And is that true for the end of
4  the workday as well?  And we can break it down
5  if we need to.  That is, were you required to
6  synch your hand-held device when you were
7  commuting from your last work location to
8  home?
9     A.   No.  You cannot synch it in the
10 car.
11    Q.   Were you required to complete
12 paperwork when you were driving from the last
13 work location to your home?
14    A.   No.
15    Q.   Were you required to participate
16 in conference calls while you were driving
17 between your last work location and home?
18    A.   No.
19    Q.   Did Crossmark ever require you to
20 pick up supplies during your drive to your
21 first work location?
22    A.   There was times when I did but it
23 was -- they didn't require specifically that
24 you do it in the beginning of the day if
25 that's what you mean.

28 (Pages 106 to 109)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

Page 110

```
 1            K. JOHNSTON
 2     Q.   Yes, ma'am.  That period between
 3  leaving home and arriving at your first work
 4  location.
 5     A.   No.  I'd have to say no to that.
 6     Q.   Did Crossmark ever require you to
 7  pick up supplies during your drive from your
 8  last work location to home?
 9     A.   No.
10     Q.   Did Crossmark ever require you to
11  stop by other customer locations on your way
12  to your first work location?
13     A.   Customer -- what do you mean by
14  customer?
15     Q.   That's kind of a hard -- I get it
16  it's sort of a hard question to understand.
17  I'm not sure if I understand it.  But let me
18  try it again.
19         Were you required to stop and
20  visit customers or other stores that might be
21  in your territory while you were driving from
22  your home to your first work location when
23  those other stores weren't really your first
24  work location?
25     A.   No.
```

Page 111

```
 1            K. JOHNSTON
 2     Q.   Same thing at the end of the day;
 3  were you ever required to stop by customer
 4  locations or any other stores when you were
 5  leaving or driving from the last work location
 6  to home?
 7     A.   Sometimes they would give us
 8  special stores to check.  And not much notice
 9  to do it.  And you might do it some -- I guess
10  I'm going to have to say maybe to that.  Can I
11  say maybe?
12     Q.   Yes, ma'am.
13     A.   Okay.  Maybe.
14     Q.   Okay.  Did Crossmark ever require
15  you to give rides to other employees during
16  your commute?
17     A.   Yes.
18     Q.   At the beginning of the workday or
19  at the end of the work day?
20     A.   Yes.  I had to drive the vice
21  president of Dannon and the DM.  Dan.  I had
22  to pick them up at their hotel and drive them
23  around one day.
24     Q.   One day?
25     A.   Yes.
```

Page 112

```
 1            K. JOHNSTON
 2     Q.   Other than that one day, did you
 3  ever give any rides to any Dannon or Crossmark
 4  employees during the commute from your home to
 5  your first work location?
 6     A.   Never.
 7     Q.   What about from the last work
 8  location to your home during that commute?
 9     A.   No.
10     Q.   Have you talked to any Crossmark
11  retail representatives who were not on the
12  Dannon dedicated team about the amount of time
13  that they had to spend commuting from their
14  home to their first work location?
15     A.   No.
16     Q.   Have you talked to any nonDannon
17  dedicated retail representatives of Crossmark
18  about the amount of time that they spent
19  commuting from their last work location to
20  their home?
21     A.   No.
22     Q.   Has anybody -- have any retail
23  reps from Crossmark ever told you that they do
24  not wish to join your collective action
25  against Dannon and Crossmark because they're
```

Page 113

```
 1            K. JOHNSTON
 2  worried about their job?
 3     A.   No.
 4     Q.   Have any retail representatives
 5  from Crossmark or Dannon, for that matter,
 6  ever told you that they feel that they will be
 7  subject to retaliation by Crossmark if they
 8  decide to participate in this lawsuit?
 9     A.   No.
10     Q.   Where were you born, Ms. Johnston?
11     A.   New Jersey.
12     Q.   Where?
13     A.   Perth Amboy.
14     Q.   Did you grow up in New Jersey?
15     A.   Yes.
16     Q.   Did you graduate from high school
17  in New Jersey?
18     A.   Yes.
19     Q.   Did you attend college?
20     A.   One year.
21     Q.   What high school did you graduate
22  from?
23     A.   Metuchen High.
24     Q.   I won't do the math but could you
25  tell me what year you graduated?
```

29 (Pages 110 to 113)

Page 142

1           K. JOHNSTON
2 team throughout the rest of the country --
3 what kind of schedule they followed?
4      A.   I don't even know if they had to
5 have a schedule.  I think Dannon requested the
6 schedule.  I don't think it was a Crossmark
7 thing.
8           MR. FOX: I'm finished with my
9      follow-up questions.  Thank you.
10 EXAMINATION BY
11 MR. BOZEMAN:
12      Q.   Just one other.  During the course
13 of your testimony you made several references
14 to Crossmark and Mapquest.
15      A.   Yes.
16      Q.   Can you tell me what that meant?
17 I mean, how does Mapquest come into play in
18 terms of travel time?
19      A.   Well, Mapquest comes into play
20 because when they assigned you your route,
21 too, the territory, they want to make sure
22 you're not traveling three hours to a store.
23 So they rely on Mapquest to help you map out
24 where you're going to go and how much time
25 it's going to take.  Because it's -- Mapquest

Page 143

1           K. JOHNSTON
2 gives you the time in minutes also how long it
3 should take you.  Not taking into
4 consideration traffic and that kind of stuff.
5           MR. BOZEMAN: Okay.  No other
6      questions.
7           MR. FOX: Thank you, Ms. Johnston.
8           THE WITNESS: Okay.  Thank you.
9      Sorry.  Hope I didn't make you guys too
10      nuts.
11           MR. POWELL: Don't go beyond the
12      thank you.
13           (Time Noted:    11:45 a.m.)
14
15
16
17
18
19           _____
20           KATHLEEN JOHNSTON
21
22 Subscribed and sworn to before me
23 this ___ day of _____, 2008.
24
25

Page 144

1
2           C E R T I F I C A T E
3 STATE OF NEW YORK   )
4                : ss.
5 COUNTY OF NEW YORK   )
6      I, FRANCIS X. FREDERICK, a Notary
7 Public within and for the State of New
8 York, do hereby certify:
9      That KATHLEEN JOHNSTON, the
10 witness whose deposition is hereinbefore
11 set forth, was duly sworn by me and that
12 such deposition is a true record of the
13 testimony given by the witness.
14      I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage, and that I
17 am in no way interested in the outcome
18 of this matter.
19      IN WITNESS WHEREOF, I have
20 hereunto set my hand this 1st day of
21 December, 2008.
22
23           _____
24           FRANCIS X. FREDERICK
25

Page 145

1
2 ---------------- I N D E X -----------------
3 WITNESS         EXAMINATION BY   PAGE
4 KATHLEEN JOHNSTON   MR. FOX      5, 126
5           MR. BOZEMAN   119, 142
6
7
8
9
10 ----------- INFORMATION REQUESTS -------------
11 DIRECTIONS:  NONE
12 RULINGS:  NONE
13 TO BE FURNISHED:  NONE
14 REQUESTS:  NONE
15 MOTIONS: 42, 124, 126, 127
16
17
18
19
20 ----------------- EXHIBITS -----------------
21 DEFENDANT'S              FOR ID.
22 Exhibit 1
23 Plaintiffs' Notice of Motion and
24 Motion For Conditional Certification
25 and Notice to the Proposed Class........ 29

37 (Pages 142 to 145)

ee7f0d36-97c5-41ad-923c-b0cf41da21b0

```
                                    Page 146
 1
 2   ----------------- EXHIBITS -----------------
 3   DEFENDANT'S                    FOR ID.
 4   Exhibit 2
 5   document entitled SalesTrak
 6   Web View Payroll Solution
 7   Training Dedicated Teams................ 72
 8   Exhibit 3
 9   e-mail dated May 29, 2008
10   bearing production numbers
11   CMK 000325 through CMK 000326........... 77
12   Exhibit 4
13   document entitled Crossmark
14   Full-time Associate Policy Manual
15   May 2004................................ 97
16   Exhibit 5
17   Employment Acknowledgement bearing
18   production number CMK 000397............ 97
19   Exhibit 6
20   Drive Time and Business Mileage
21   Reimbursement Policy bearing
22   production numbers
23   CMK 000317 through CMK 000320........... 97
24
25
```

```
                                    Page 147
 1
 2   NAME OF CASE:  JOHNSTON v. DANNON
 3   DATE OF DEPOSITION:  NOVEMBER 24, 2008
 4   NAME OF WITNESS:  KATHLEEN JOHNSTON
 5   Reason codes:
        1. To clarify the record.
 6      2. To conform to the facts.
        3. To correct transcription errors.
 7   Page _____ Line _____ Reason _____
     From _____ to _____
 8
     Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
     From _____ to _____
11
     Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14
     Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20
     Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23
24
25   _____
        KATHLEEN JOHNSTON
```

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

KATHLEEN JOHNSTON, LORETTA      )
WEIGNER and JANICE FAHRENHOLTZ,)
on behalf of themselves and    )
all others similarly situated, )
                               )
d              Plaintiffs,      )
                               )
         vs.                   ) No. 08-1525
                               ) (SDW)
CROSSMARK, INC., and the       )
DANNON COMPANY,                )
                               )
            Defendants.        )
------------------------------)


DEPOSITION OF LORETTA WEIGNER

Princeton, New Jersey

Monday, November 24, 2008


Reported by:
FRANCIS X. FREDERICK, CSR, RPR, RMR
JOB NO. 19835



EXHIBIT
"6"

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 2

```
 1
 2
 3
 4
 5              November 24, 2008
 6              12:11 p.m.
 7
 8
 9              Deposition of LORETTA WEIGNER,
10     held at the offices of Mason Griffin, 101
11     Poor Farm Road, Princeton, New Jersey,
12     pursuant to Notice, before Francis X.
13     Frederick, a Certified Shorthand
14     Reporter, Registered Merit Reporter and
15     Notary Public of the States of New York
16     and New Jersey.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2     A P P E A R A N C E S :
 3
 4     POWELL BOZEMAN
 5     Attorneys for Plaintiffs
 6          1900 Knight Circle
 7          Yardley, Pennsylvania 19067
 8     BY:  WAYNE D. BOZEMAN, ESQ.
 9          DR. RALPH A. POWELL, ESQ.
10
11     FISH & RICHARDSON, P.C.
12     Attorneys for Defendants
13          1717 Main Street, Suite 5000
14          Dallas, Texas 75201
15     BY:  STEPHEN E. FOX, ESQ.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    L. WEIGNER
 2     L O R E T T A   W E I G N E R,  called as
 3          a witness, having been duly sworn by a
 4          Notary Public, was examined and
 5          testified as follows:
 6     EXAMINATION BY
 7     MR. FOX:
 8          Q.    Would you please state your full
 9     name?
10          A.    Loretta D. Weigner.
11          Q.    Ms. Weigner, my name is Steve Fox.
12     I'm an attorney who represents Crossmark, Inc.
13     and the Dannon Corporation in a lawsuit that
14     you filed against them.
15               We're here today to ask some
16     questions about some information that's been
17     submitted to the court.  Do you understand
18     that we are here to ask those questions of
19     you?
20          A.    Yes.
21          Q.    Have you ever been deposed before?
22          A.    Never.
23          Q.    Let's go through some ground rules
24     so that things will go smoothly between us.
25          A.    Okay.
```

Page 5

```
 1                    L. WEIGNER
 2          Q.    First of all, do you understand
 3     that you're under oath?
 4          A.    I do.
 5          Q.    Do you understand that you've been
 6     sworn to tell the truth?
 7          A.    Yes.
 8          Q.    Do you understand that there are
 9     penalties for perjury if it's learned at some
10     later point that your testimony was not
11     truthful?
12          A.    Yes.
13          Q.    Do you understand that your
14     testimony today in this conference room has
15     the same force and effect as if you were
16     testifying in the federal courthouse in
17     Trenton?
18          A.    Yes.
19          Q.    If you'll continue to do what
20     you've done thus far things will go smoothly.
21     And that is allow me to finish asking my
22     question before you begin to pose your answer.
23     And then, likewise, I'll try to allow you to
24     finish answering before I ask another
25     question.  Is that acceptable?
```

2 (Pages 2 to 5)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 34

L. WEIGNER
1        L. WEIGNER
2     record for a minute?
3        MR. FOX:  Yes.
4        (Discussion held off the record.)
5     BY MR. FOX:
6        Q.   The allegation about the technical
7     errors that occurred in the use of an
8     electronic scanning device, those relate to
9     the alleged failure by Crossmark to pay you
10    and other employees for administrative time.
11       A.   Correct.
12       Q.   Let's talk about this alleged
13    underpayment of wages because of the computer
14    time keeping issue.
15           From January 2006 until the
16    current day, you have used a system called
17    SalesTrak to report the time that you worked
18    for Crossmark, correct?
19       A.   Um-hum, yes.
20       Q.   You reported that time in the
21    number of minutes worked, correct?
22       A.   Exactly.
23       Q.   With respect to recording that
24    time did you personally record the time that
25    you worked or did you have other people record

Page 35

L. WEIGNER
1        L. WEIGNER
2     it for you?
3        A.   Oh, never have anyone recorded but
4     yourself.
5        Q.   So the answer is I was the only
6     one who recorded my time.
7        A.   Exactly, yes.
8        Q.   Did you understand when you worked
9     at Crossmark that it was your responsibility
10    to accurately record the time that you worked?
11       A.   Well, quite frankly that only
12    happened three years ago.  Previous to that we
13    were salaried employees.  We had none of this
14    silliness.
15       Q.   Okay.  Let me move to strike that
16    answer as nonresponsive.
17           Did you understand when you worked
18    for Crossmark that it was your responsibility
19    to accurately record the time that you worked?
20       A.   Yes.
21       Q.   Now, during the same time period,
22    January 2006 to the present, Crossmark was
23    using a software program called Lawson to pay
24    its retail representatives, correct?
25       A.   I think so.

Page 36

L. WEIGNER
1        L. WEIGNER
2        Q.   What understanding do you have of
3     how the Lawson system works?
4        A.   My understanding is -- and this is
5     only hearsay -- I did, in fact, call down to
6     HR and send an e-mail about the five minutes
7     shortage.  And I'm trying to remember her
8     name.  She was part of the payroll department.
9     She said they're using Lawson.  It's a new
10    system we're using.  And it goes up and down.
11           I said to her, Well, it never goes
12    up.  It always goes down.  She said we're
13    going to fix that.
14       Q.   Okay.  So that was kind of your
15    introduction to the Lawson system?
16       A.   Um-hum.  Yes.
17       Q.   Do you understand that the Lawson
18    system takes the minutes that you record in
19    SalesTrak and converts them to hours worked?
20       A.   I do.
21       Q.   You've mentioned this idea of five
22    minutes.  Can you describe for me the computer
23    error that you claimed that was occurring that
24    resulted in the pay shortages that you allege
25    occurred?

Page 37

L. WEIGNER
1        L. WEIGNER
2        A.   I would put in my 2,400 minutes.
3     I would go in every Saturday morning and check
4     my e-mails to see what was there.  The
5     following week when payroll came over we use a
6     system called My Info to go in and look at
7     your pay stub and what you're being paid for.
8     I was being paid 39.95.  I personally did not
9     pick this up myself.  Another employee told me
10    to take a look at it which is when we started
11    looking at it.
12       Q.   Who told you to take a look at it?
13       A.   Cathy Lombardi.
14       Q.   Is Cathy still employed by
15    Crossmark?
16       A.   She is.
17       Q.   Now, do you contend that this
18    computer time keeping issue always benefited
19    Crossmark?
20       A.   Absolutely.
21       Q.   Have you ever reviewed or compared
22    your own SalesTrak report and your Lawson
23    payroll record or the payroll stub to
24    determine whether the rounding error ever
25    benefited you?

Page 42

L. WEIGNER

1
2  duties that are performed on a daily basis by
3  retail representatives who are not on the
4  Dannon dedicated team?
5      A.  I would say I know.  We see each
6  other in the stores and we see each other in A
7  Trains and we talk.  I see what they're doing
8  and they see what I'm doing.
9      Q.  Do they do the exact same job
10  duties as you?
11      A.  No.
12      Q.  Their duties are somewhat
13  different?
14      A.  Yes.
15      Q.  How are they different?
16      A.  Well, they have different projects
17  than we have.  They do a Walmart thing where
18  they fill shelves and build different shelves
19  and displays.  They do a Milstone product
20  where they fill coffee things.  Sometimes they
21  do total resets.  Sometimes they do exactly
22  what we do.  Sometimes they write credits.
23      Q.  While you see in some of your
24  stores and talk at A Train meetings to
25  employees in the Pennsylvania geographic area

Page 43

L. WEIGNER

1
2  which might include New Jersey and Delaware
3  and Maryland, do you have any understanding of
4  what retail representatives at Crossmark do
5  outside of that area?
6      A.  No.
7      Q.  To what extent do you know what
8  hours are worked on a daily basis by retail
9  representatives who are not on the Dannon
10  dedicated team?
11      A.  I don't have anything factual.
12      Q.  I understand that you use a
13  hand-held device in connection with performing
14  your duties with the Dannon dedicated team and
15  that you've been using it since approximately
16  December 2007, correct?
17      A.  Correct.
18      Q.  To what extent do retail
19  representatives who are not on the Dannon
20  dedicated team use hand-held devices?
21      A.  Quite frankly, I don't know.  They
22  have a little device.  I see it.  I certainly
23  have never used it.
24      Q.  So sometimes you've seen some
25  people with a hand-held device who don't work

Page 44

L. WEIGNER

1
2  on a Dannon dedicated team but you don't know
3  to what extent they use that.
4      A.  No.  A Profetti team I've met in
5  the store.  They also have a hand-held like
6  mine.  Land-o-Lakes used what they called an
7  IPAC which is a different device than ours.
8  But still a hand-held device.
9      Q.  What about outside of Land-o-Lakes
10  and the people that you've seen in some
11  stores.  I think you said it was the Peretti?
12      A.  Profetti.
13      Q.  Profetti?
14      A.  Um-hum.
15      Q.  Other than people in the Profetti
16  or Land-o-Lakes team, do you have any idea
17  whether other retail representatives of
18  Crossmark use hand-held devices?
19      A.  No.
20      Q.  Now, you've alleged in the -- in
21  an affidavit that you submitted in support of
22  this motion for conditional certification that
23  the computer time keeping issues were fixed in
24  September 2008.
25      A.  Is that two months ago?

Page 45

L. WEIGNER

1
2      Q.  Yes, ma'am.  It would be.
3      To what extent do you understand
4  or how is it that you understand that these
5  alleged computer time keeping issues were
6  resolved or fixed in September 2008?
7      A.  Al Gallion was the one that told
8  me.  I looked and I thought, wow, I'm getting
9  paid for exactly what I put in.  But the fact
10  that I'm on light duty mine could be
11  different.
12      So I check my every week to make
13  sure I'm getting paid correctly.  Al Gallion
14  called me and told me -- and this is
15  hearsay -- he spoke with payroll and they told
16  him it was fixed.  Cathy Lombardi also told me
17  that hers was 2,400 minutes for the last
18  couple weeks.
19      Q.  All right.  Let's discuss your
20  allegations concerning unpaid administrative
21  time.
22      Can you describe for me what
23  administrative tasks you perform at the
24  beginning of each workday?
25      A.  Pretty much you have to

12 (Pages 42 to 45)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 46

L. WEIGNER

1   synchronize your computer, the hand-held. You
2   have to read your e-mails. Check your voice
3   mails. Depending on what is on e-mail
4   sometimes you need to print things out and put
5   them in your pitch book. Load them up in your
6   car and off you come.
7       Q.   What administrative tasks if any
8   do you perform at the end of your workday?
9       A.   There's more involved at the end.
10  You have to come home, you have to
11  double-check what you've put in your hand-held
12  to make sure it's correct. Or at least I do.
13  Any pictures we've had to take during the
14  day -- which is an extremely big thing with
15  Dannon. You must take pictures, digital
16  pictures. Take the digital pictures. They
17  must be downloaded. Previous we used to send
18  them over. We now have a form. So we have to
19  compress it. It's very timely to do that.
20  Compress the pictures. Fill in the
21  information. They have to be forwarded on to
22  Dannon and to Crossmark. Check voice mail
23  again. Check e-mail. See if anything is new.
24  Periodically there'll be, you know, a recall

Page 47

L. WEIGNER

1   of one of the products. Or there will be a
2   new distribution sheet that needs to be
3   printed out again. And then you synchronize
4   your computer. And when it does not
5   synchronize, which some days it does. Other
6   days you might do it five, six, seven times.
7   If you can't get it done within then you have
8   to call what's called the Help Desk down in
9   Texas. And they're not in Texas anymore.
10  They're in -- I don't know -- San somewhere.
11  And hopefully they'll be able to fix it for
12  you.
13      Q.   In connection with calling the
14  help desk for assistance on the synching
15  process, did you do that in the morning or in
16  the evening?
17      A.   Depends on when you need the help.
18      Q.   Okay. So it could have happened
19  on either end of the day?
20      A.   Correct.
21      Q.   How much time did you take to
22  perform the administrative tasks that you
23  listed in the morning? And just for your
24  recollection you said you synched the

Page 48

L. WEIGNER

1   hand-held, read e-mail, checked voice mail,
2   and printed out documents from time to time.
3   On average how much time did it take you to do
4   those?
5       A.   That would depend on how well the
6   synch went through. Sometimes 25, 30 minutes.
7   It would go right through, boom, you're okay.
8   Other days you have to resynch and resynch.
9       Q.   And so you're saying it would take
10  longer?
11      A.   Absolutely. Because every time
12  you do it you have to, you know, plug back in.
13      Q.   And how long would it take you to
14  perform the administrative tasks that you
15  listed at the end of the day?
16      A.   I spend approximately -- and this
17  is not every day so don't take that --
18  approximately an hour, an hour and 15 minutes
19  until recently now we have a new project.
20      Q.   So tell me what takes -- what goes
21  into this hour to hour and 15 minutes? You're
22  saying on average that's what you take.
23      A.   Yes. Well, on average, yes.
24  Pretty much I come home, check my voice mail.

Page 49

L. WEIGNER

1       Q.   How long does that take?
2       A.   Oh, just a few minutes. Depending
3   on what's said and what needs to be done.
4   Then I check my e-mail. Usually there's
5   something that needs to be fixed.
6           And I will just give you a
7   hypothetical explanation. We're doing a
8   project right now called mapping. I received
9   an e-mail this morning but I'm off today so
10  I'll do it tomorrow morning. Some of the
11  in -- the information that I input myself and
12  many other people, the e-mail was directed to
13  half the team. These have to go in and be
14  fixed. How long this is going to take I'd say
15  25, 30 minutes.
16      Q.   So on average it takes you 25 to
17  30 minutes to respond to e-mail?
18      A.   No.
19      Q.   No? On average how long does it
20  take to respond to e-mail, to look at and
21  respond to e-mail at the end of the day?
22      A.   It depends on what's on there what
23  has to be done. Some you just read. Some you
24  need to address.

13 (Pages 46 to 49)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 50

L. WEIGNER

1    Q.    So some days it would take a few
2  minutes. Some days it would take longer than
3  a few minutes?
4    A.    Exactly.
5    Q.    Is there any rhyme or reason to
6  it?
7    A.    None.
8    Q.    Then in downloading the digital
9  pictures and forwarding them, how long does
10  that take?
11    A.    That takes a long time. I would
12  say approximately 45 minutes.
13    Q.    Where you sit in front of a
14  computer and allow for the downloading to take
15  place? Or do you just -- you try to send --
16  first of all, you have to compress the data
17  and then you send the data.
18    A.    Exactly.
19    Q.    You're not sitting in front of the
20  computer while it's being compressed, are you?
21    A.    Of course I am. To see if it's
22  going through properly.
23    Q.    To compress the data you sit in
24  front of the computer and watch it.

Page 51

L. WEIGNER

1    A.    It's a picture you compress to a
2  smaller form.
3    Q.    Right. I understand how to do it.
4    A.    Okay.
5    Q.    Yeah. So you sit in front of the
6  computer while the compression is taking
7  place.
8    A.    I do.
9    Q.    All right. Other than -- when
10  you're doing that are you doing other things?
11    A.    No.
12    Q.    You're sitting in front of the
13  computer watching the data be compressed.
14    A.    I am.
15    Q.    Okay. And then how long does it
16  take you to forward it once it's been
17  compressed?
18    A.    Once it's been compressed a couple
19  of minutes.
20    Q.    How long have you been downloading
21  digital pictures and sending them?
22    A.    Only about -- maybe a little over
23  a year.
24    Q.    How long does it take you to check

Page 52

L. WEIGNER

1    the information that you've input into the
2  hand-held?
3    A.    It takes me about ten minutes.
4    Q.    And then how long does the synch
5  process take?
6    A.    Depending on if it goes through or
7  not.
8    Q.    So before the synch device was --
9  or the hand-held device was being used
10  beginning in December 2007, and before you had
11  to download digital pictures, it sounds like
12  it took you roughly 15 minutes or so to do
13  your administrative tasks at the end of the
14  day; is that fair?
15    A.    Not quite. I would say 20, 25.
16  The reason being we get a lot of voice mails,
17  a lot of e-mails at the end of the day. And
18  previous to downloading pictures we had to
19  take pictures with a regular camera. And of
20  course you have to take it somewhere, get them
21  developed, bring them back, glue them on a
22  form, and send them off.
23    Q.    What is Crossmark's policy with
24  respect to recording administrative time spent

Page 53

L. WEIGNER

1  by you, a retail representative, in SalesTrak?
2    A.    What am I allowed to put in?
3    Q.    What's Crossmark's policy?
4    A.    Thirty minutes a day.
5    Q.    And how do you understand that to
6  be the policy?
7    A.    I was verbally told by Betty
8  Beatie. I was verbally told by Christian. I
9  was verbally told by Izabela.
10    Q.    So let's break that down. Tell me
11  exactly what Betty Beatie told you about
12  recording administrative time.
13    A.    Betty Beatie said on a conference
14  call 30 minutes for admin time.
15    Q.    She said that was the goal?
16    A.    No. That's the time allotted.
17    Q.    Did she tell you that you couldn't
18  record administrative time beyond 30 minutes?
19    A.    They would prefer that we did not.
20    Q.    With respect to your conversation
21  with Mr. Garcia did he tell you -- or tell me
22  what he told you about recording
23  administrative time.
24    A.    Christian always told us you get

14 (Pages 50 to 53)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 54

```
 1            L. WEIGNER
 2    30 minutes a day.  No more, no less.  Because
 3    it cuts into your work in the field.
 4         Q.   Did he ever tell you that you
 5    could not record more than 30 minutes for
 6    administrative time during the work day?
 7         A.   No, he never did.
 8         Q.   What did Izabela tell you about
 9    recording administrative time?
10         A.   Izabela said our policy is 30
11    minutes.
12         Q.   Did she ever tell you that you
13    could not record more than 30 minutes
14    administrative time on any particular workday?
15         A.   What Izabela said, and this would
16    be a conference call or a Friday morning call,
17    if you need the 45 minutes and you're not
18    going over the 2,400 minutes it's okay.
19         Q.   So let me see if I can sort of
20    again take that and then ask this question
21    with it.  Did she ever tell you that you were
22    not permitted by policy to record more than 30
23    minutes for administrative time on any given
24    workday?
25         A.   No.
```

Page 55

```
 1            L. WEIGNER
 2         Q.   Mr. Garcia, Ms. Beatie, and
 3    Izabela all work on the Dannon dedicated team,
 4    correct?
 5         A.   Correct.
 6         Q.   What basis do you have for
 7    believing that retail representatives who were
 8    not employed on the Dannon dedicated team were
 9    told to record only 30 minutes of
10    administrative time during any given workday?
11         A.   I have no idea.  I've never made
12    that statement.
13         Q.   Today are you recording more than
14    30 minutes administrative time?
15         A.   Today?
16         Q.   Yes, ma'am.
17         A.   I'm recording none today.  I'm off
18    today.
19         Q.   Okay.  That was literally what I
20    asked you.  So let me change it.
21              At the current time when recording
22    time in SalesTrak, are you recording more than
23    30 minutes a day for administrative time?
24         A.   Yes.  We are right now because
25    we're doing a new project.
```

Page 56

```
 1            L. WEIGNER
 2         Q.   When did you begin recording more
 3    than 30 minutes administrative time in
 4    SalesTrak?
 5         A.   The project started two weeks ago.
 6         Q.   Are you -- do you -- have you
 7    since -- let me start over again.  Between
 8    January 2006 and the present time, have you
 9    ever accurately recorded all of the
10    administrative time that you spent working?
11         A.   No.
12         Q.   And why not?
13         A.   Because I have to be very careful
14    with my minutes.  See, we're using a hand-held
15    out in the field.  And I don't know how
16    familiar you are with them.  You'll do one --
17    the hand-held has several projects in it and
18    you said you have seen them.  There will be
19    one project and it will say PC distribution.
20    You have 30 minutes to do that.  So you do
21    that.  Then you're doing a Frusion neck
22    hanger.  When you're doing that you're hanging
23    things on the bottles.
24              Sounds like a fun job, huh?
25              And depending on how much time
```

Page 57

```
 1            L. WEIGNER
 2    that takes, you also put that time in.  I'm
 3    trying to think of -- well, and a lot of time
 4    we have what we call no-scan items.  Items
 5    that have not scanned through the grocery
 6    stores.  Maybe one of the new yogurts, maybe a
 7    blueberry fruit on the bottom.  So we have to
 8    check that.  We get additional -- we put
 9    minutes in for that.  If it takes me five
10    minutes to find it, ten minutes, I put that in
11    the hand-held.
12              Close out that store, go onto the
13    next one.  It's very hard to keep in your head
14    how many minutes you've put in a day at the
15    end of the day until you've synchronized.
16         Q.   And this difficulty is because you
17    can't remember it?
18         A.   Yeah.  Me and everybody else.
19         Q.   Okay.  Do you understand that it's
20    Crossmark's policy that all time spent by a
21    retail representative performing
22    administrative tasks should be recorded?
23         A.   I do.
24         Q.   How do you know that to be the
25    case?
```

15 (Pages 54 to 57)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 58

L. WEIGNER

1            L. WEIGNER
2       A.   I'm not sure if I saw it in the
3 company handbook or I heard it in a conference
4 call but I have heard that.
5       Q.   Okay. So if that's the company's
6 policy have you followed that policy?
7       A.   I put my admin time in as I can.
8 I put my 30 minutes a day in. But in order to
9 get my job done I need to do more. And I
10 don't charge them for it.
11       Q.   Is that your fault or the
12 company's fault?
13       A.   Well, if they gave us less to do
14 then I wouldn't have to do that, would I?
15       Q.   If you understand -- or to the --
16 start over again.
17         The company's policy is that
18 retail representatives are to accurately
19 record all time spent on administrative tasks,
20 right?
21       A.   Correct.
22       Q.   So if the retail representative
23 doesn't accurately record the amount of time
24 that they spend on administrative tasks whose
25 fault is that? The company's fault or the

Page 59

1            L. WEIGNER
2 retail representative's fault?
3       A.   It would be our fault. But if we
4 put all the admin time in at the end of the
5 week if we have 2,600 minutes we're
6 reprimanded and somebody will write us up.
7       Q.   Have you ever been reprimanded for
8 putting --
9       A.   I've never done it.
10       Q.   Well, have you ever heard of
11 anybody else being reprimanded?
12       A.   I have.
13       Q.   Who?
14       A.   Izabela reprimanded a girl down in
15 Maryland because she put in for overtime. But
16 we're not allowed to have overtime.
17       Q.   Well, putting in for overtime is
18 different than recording accurately recording
19 administrative time.
20       A.   It is not.
21       Q.   Okay. I believe it to be
22 different. I guess you can share your own
23 view.
24         Here's the question. If you're
25 told by policy to accurately record all

Page 60

1            L. WEIGNER
2 administrative time spent by you, the retail
3 representative, on administrative tasks, then
4 how can the company reprimand you for doing
5 what they've told you to do?
6       A.   Because that policy's only been in
7 effect for about four months.
8       Q.   How do you know it's only been in
9 effect for four months?
10       A.   Because we were told previous 30
11 minutes a day.
12       Q.   And again that was Mr. Garcia?
13       A.   Yes, it was.
14       Q.   Allegedly Mr. Garcia. Allegedly
15 Izabela. And allegedly Ms. Beatie.
16       A.   Yes. We have a new supervisor and
17 this has been her policy, accurately put in
18 all your admin time.
19       Q.   Let's go back to this idea that
20 somebody was reprimanded. This person that
21 was allegedly reprimanded by Izabela was it
22 because the person put in all of their
23 administration time?
24       A.   I don't really know.
25       Q.   Okay.

Page 61

1            L. WEIGNER
2       A.   What I do know is they got
3 reprimanded because they had over 2,400
4 minutes.
5       Q.   So you don't understand -- it
6 could be the case that the person put in for
7 overtime when they hadn't asked for approval
8 of that overtime before putting it in,
9 correct?
10       A.   No. You need to ask for approval
11 before you can put in for any overtime.
12       Q.   Do you know whether or not this
13 person --
14       A.   No, I do not.
15       Q.   And that's my point. You don't
16 know whether this person sought that approval
17 before putting it in, do you?
18       A.   No, I do not.
19       Q.   So it could be the case that she
20 put -- she recorded overtime hours but had not
21 sought and obtained approval to do that,
22 correct?
23       A.   That could very well be.
24       Q.   Under those circumstances would
25 you agree that would be appropriate to

16 (Pages 58 to 61)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 70

L. WEIGNER

1    L. WEIGNER
2    A F T E R N O O N   S E S S I O N
3    (Time noted:    1:37 p.m.)
4  L O R E T T A   W E I G N E R,   resumed and
5    testified as follows:
6  EXAMINATION BY (Cont'd.)
7  MR. FOX:
8    Q.   Let's move on to the allegations
9  about drive time.  You claim that Crossmark
10 failed to compensate you for the time spent
11 driving from your home to your first work
12 location of the day, correct?
13   A.   Crossmark's policy is the first
14 hour is on you, the last hour is on you.
15   Q.   Okay.  Do you believe that you
16 should be paid for that hour drive time
17 between --
18   A.   Absolutely.
19   Q.   Let me finish asking my questions
20 before you answer them.
21        On average how long does it take
22 you to drive from your home to your first work
23 location at the beginning of the day?
24   A.   Depends on where I need to go.  If
25 I have to go to Reading it's over an hour.  If

Page 71

L. WEIGNER

1    L. WEIGNER
2  I go to upper Montgomery County -- if I work
3  locally it might be 20 minutes.
4    Q.   Is there a particular day that you
5  know that you're going to need to drive over
6  an hour while other days you're going to drive
7  less than 20 minutes?
8    A.   Yes.
9    Q.   What day of the week do you go to
10 the Reading stores?
11   A.   I usually go to Reading on a
12 Wednesday or a Thursday.
13   Q.   Why is that?
14   A.   It fits into my routine.
15   Q.   What part of your routine is
16 addressed by having you go Wednesday or
17 Thursday?
18   A.   It depends when your dairy
19 managers are in so you're able to speak --
20 because they all have different days off.
21 Some work night crew.  Some come in -- so I
22 try to work my schedule that I'm in an area
23 that I can see the most amount of people in
24 the shortest amount of time.
25   Q.   So if you're driving to Reading it

Page 72

L. WEIGNER

1    L. WEIGNER
2  may take over an hour.  If it's a more of a
3  local trip it may take 20 minutes or so?
4    A.   Correct.
5    Q.   If it takes you longer than an
6  hour to drive from your home to your first
7  work location Crossmark compensates you for
8  the time spent driving that exceeds an hour,
9  correct?
10   A.   Yes.
11   Q.   So when you're entering time in
12 SalesTrak you record any drive time that
13 exceeds one hour at the beginning of the drive
14 time, correct?
15   A.   Correct.
16   Q.   And is the same true with respect
17 to drive time at the end of the day; if it
18 exceeds one hour do you record the amount of
19 time that exceeds an hour?
20   A.   I do.
21   Q.   What proof do you have that it
22 takes all Crossmark retail representatives
23 that you seek to represent in this lawsuit the
24 same amount of time to drive from their home
25 to their first work location at the beginning

Page 73

L. WEIGNER

1    L. WEIGNER
2  of the workday?
3    A.   You finished?
4    Q.   Yes, ma'am.
5    A.   Oh, okay.  It was like you were
6  going to say something else.
7        I don't have any proof.  It's
8  hearsay but I know where they go in their
9  territories.
10   Q.   When you say they, you're again
11 talking about the people on the Dannon
12 dedicated team?
13   A.   No.  The retail team.  People that
14 you know that you bump into and talk to.  And
15 who had to drive an hour, hour and a half.
16 And it's -- well, not to use any foul language
17 but they do out in the field about the drive
18 time.
19   Q.   But their drive time, are you
20 telling me that it is exactly the same as
21 yours?
22   A.   No.  Absolutely not.
23   Q.   So their drive time would vary
24 from the drive time that you've testified
25 about.

19 (Pages 70 to 73)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 74

L. WEIGNER

1
2    A.   Certainly.  Everybody's drive time
3    varies.
4    Q.   Now, do you stay at the same work
5    location throughout the day?
6    A.   I stay within the same area.
7    Q.   But you visit different stores in
8    that area?
9    A.   I do.
10   Q.   So you typically travel from one
11   work location to another during your workday?
12   A.   One store to another.
13   Q.   Yes.
14   A.   Yes.
15   Q.   And when I say work location, if
16   it's a store for you that's what I'm talking
17   about.
18   A.   Okay.
19   Q.   You're not claiming, are you, that
20   Crossmark fails to compensate you for time
21   spent driving between the first and second
22   locations, are you?
23   A.   No.
24   Q.   Or any locations thereafter other
25   than at the end of the day.

Page 75

L. WEIGNER

1
2    A.   And the beginning.
3    Q.   So it's your belief that Crossmark
4    pays you for drive time spent between -- or
5    driving between the first work location and
6    the last work location.
7    A.   Absolutely.
8    Q.   If you look at Exhibit 4.  That's
9    the Associate Policy Manual.  Do you recall
10   receiving the May 2004 Associate Policy Manual
11   during your employment at Crossmark?
12   A.   I do.
13   (Defendant's Exhibit 7, Employment
14   Acknowledgement bearing production number
15   CMK 000398, marked for identification as
16   of this date.)
17   BY MR. FOX:
18   Q.   Exhibit 7 is an employment
19   acknowledgement form.  Do you see that?
20   A.   The one in front of me?
21   Q.   Yes, ma'am.
22   A.   Um-hum.  I do.
23   Q.   Is that your signature?
24   A.   It is.
25   Q.   And on this document in placing

Page 76

L. WEIGNER

1
2    your signature on it you were certifying that
3    you read the company full-time associate
4    policy manual, correct?
5    A.   When I signed that I said I would
6    read the manual.  They were given out.
7    Q.   Okay.  It acknowledges at a
8    minimum your receipt of it.
9    A.   Yes.
10   Q.   Look at page 16 of the handbook.
11   A.   Okay.
12   Q.   At the bottom of page 16 there's a
13   heading Travel Time Drive Time.
14   A.   Um-hum.
15   Q.   Do you see that?
16   A.   I do.
17   Q.   Take a look at that for a minute
18   and then let me ask you if you understood that
19   was the policy of the company while you worked
20   there.
21   (Document review.)
22   A.   I do.  To be honest with you, I
23   really don't understand.  Pay for the travel
24   time work is included in the associate's
25   project pay which we don't get.  Or hourly

Page 77

L. WEIGNER

1
2    rate.
3    Q.   Which you do get.
4    A.   Yes.
5    Q.   Okay.  If you will, look at
6    Exhibit 6.  That's a policy and procedure from
7    Crossmark's managers' manual.  It's also
8    maintained on the company's website concerning
9    drive time.
10   Do you see that?
11   A.   Um-hum.
12   Q.   And this -- I don't need to ask
13   you any questions about it other than to point
14   out that it provides the same information or
15   similar information about drive time.
16   In paragraph 3.1.  Do you see
17   that?
18   A.   I do.
19   Q.   Now, on what basis do you contend,
20   that is, why do you believe that Crossmark
21   should compensate you for the time you spend
22   commuting from your home to your first work
23   location and then time spent commuting from
24   your last work location to your home?
25   A.   Because my day starts before I get

Page 78

L. WEIGNER

1
2  into my car and my day finishes after I get
3  out of my car.
4      Q.   When you say it begins you're
5  saying that you have to undertake some
6  administrative tasks before you drive to your
7  first work location?
8      A.   Correct.
9      Q.   And when you say that you ought to
10  be paid for the drive time at the end of the
11  workday it's because there are some additional
12  administrative tasks that you perform after
13  you arrive home from the last work location?
14     A.   Correct.
15     Q.   Now, when you're driving from home
16  to your first work location Crossmark doesn't
17  require you to complete paperwork in the car,
18  does it?
19     A.   No.
20     Q.   Crossmark doesn't require you to
21  synch your hand-held device during that
22  commute, does it?
23     A.   Well, you couldn't.
24     Q.   So it doesn't require you to do
25  it.

Page 79

L. WEIGNER

1
2      A.   No.
3      Q.   You're not required by Crossmark
4  to perform any duties during your commute at
5  the beginning of the work day, are you?
6      A.   At the beginning of the workday?
7  Before I leave my house.
8      Q.   Right.  And I'm focusing right now
9  on the commute time.
10     A.   Oh, the commute time, okay.
11     Q.   Crossmark doesn't require you to
12  perform any duties during the commute from
13  your home to your first work location, does
14  it?
15     A.   No, they do not.
16     Q.   Are you ever required to
17  participate in conference calls during your
18  commute?
19     A.   No.
20     Q.   With respect to the end of the
21  workday and that commute process, does
22  Crossmark require you to complete any
23  paperwork during the commute, itself?
24     A.   No.
25     Q.   Does it require you to synch

Page 80

L. WEIGNER

1
2  your hand-held device during the commute?
3      A.   No.
4      Q.   Does it require you to perform any
5  duties during the commute at the end of the
6  day?
7      A.   No.
8      Q.   Are you required to participate in
9  conference calls during the commute at the end
10  of the day?
11     A.   No.
12     Q.   Did Crossmark or does Crossmark --
13  has Crossmark ever required you to pick up
14  supplies during your drive to your first work
15  location?
16     A.   Periodically.  It's not a normal
17  thing.  I'll have to stop at the office, grab
18  something.
19     Q.   Like what?
20     A.   Point of sale.  Maybe a rack.
21  Maybe a case that I have to put shelves in a
22  store.
23     Q.   How often does that happen?
24     A.   Depends on what -- well, like if
25  we're having a project where we're putting the

Page 81

L. WEIGNER

1
2  shelves in I have to make sure I have enough
3  with me to cover a territory.  So that might
4  be once a week.  Other times it might be once
5  a month.  I mean, it's not a regular thing
6  that you have to do on a weekly basis.
7      Q.   Has Crossmark ever required you to
8  stop by customer locations on your way from
9  your home to your first work location?  So you
10  already know where you're going, you know what
11  your first work location of the day is.  Does
12  Crossmark ever require you to make any stops
13  from your home to the work location?
14     A.   Let me see if I understand you.
15  You mean another store than the one I planned
16  on going to?
17     Q.   Yes.  Let's go with that.
18     A.   All right.  I have been required
19  to stop at the office for one thing or
20  another.  I've also been required to stop at a
21  store.  We don't do it anymore.  Maybe we had
22  to write up a credit for something that
23  happened.  Or there's an item they're pulling
24  off the shelf.  I might have to run in and do
25  that on my way.

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

Page 98

L. WEIGNER

1
2     A.   No.
3     Q.   When you testified that overtime
4  would not be approved that's simply
5  speculation on your part, correct?
6     A.   Correct.
7        MR. FOX:  Nothing further.
8        THE WITNESS:  Good.
9        MR. BOZEMAN:  Okay.  I'm done,
10  too.
11        (Time Noted:     2:15 p.m.)
12
13
14
15
16
17
18
19        _____
20        LORETTA WEIGNER
21
22  Subscribed and sworn to before me
23  this ___ day of _____, 2008.
24
25  _____

Page 100

1
2  ---------------- I N D E X ----------------
3  WITNESS          EXAMINATION BY      PAGE
4  LORETTA WEIGNER      MR. FOX          4, 97
5            MR. BOZEMAN        89
6
7
8  ---------- INFORMATION REQUESTS -----------
9  DIRECTIONS:  NONE
10  RULINGS:  NONE
11  TO BE FURNISHED:  NONE
12  REQUESTS:  NONE
13  MOTIONS: 90, 92
14
15  ---------------- EXHIBITS ----------------
16  DEFENDANT'S               FOR ID.
17  Exhibit 7
18  Employment Acknowledgement bearing
19  production number CMK 000398............ 75
20  ---------------- EXHIBITS ----------------
21  PLAINTIFF'S               FOR ID.
22  Exhibit 1
23  five-page e-mail string................. 93
24
25

Page 99

1
2        C E R T I F I C A T E
3  STATE OF NEW YORK   )
4              : ss.
5  COUNTY OF NEW YORK   )
6        I, FRANCIS X. FREDERICK, a Notary
7  Public within and for the State of New
8  York, do hereby certify:
9        That LORETTA WEIGNER, the witness
10  whose deposition is hereinbefore set
11  forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14        I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I
17  am in no way interested in the outcome
18  of this matter.
19        IN WITNESS WHEREOF, I have
20  hereunto set my hand this 1st day of
21  December, 2008.
22
23        _____
24        FRANCIS X. FREDERICK
25

Page 101

1
2  NAME OF CASE: JOHNSTON v. DANNON
3  DATE OF DEPOSITION: NOVEMBER 24, 2008
4  NAME OF WITNESS: LORETTA WEIGNER
5  Reason codes:
      1. To clarify the record.
6     2. To conform to the facts.
      3. To correct transcription errors.
7  Page _____ Line _____ Reason _____
   From _____ to _____
8
   Page _____ Line _____ Reason _____
9  From _____ to _____
10 Page _____ Line _____ Reason _____
   From _____ to _____
11
   Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
   From _____ to _____
14
   Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
   From _____ to _____
17
   Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
   From _____ to _____
20
   Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
   From _____ to _____
23
24
25        LORETTA WEIGNER

26 (Pages 98 to 101)

3dd74bf3-d482-43f5-b3c1-edc98ad7e349

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

KATHLEEN JOHNSON, LORETTA   : NO. 08-1525
WEIGNER and JANICE           : (SDW)
FAHRENHOLTZ, on behalf of   :
themselves and all others   :
similarly situated,          :
     Plaintiffs          :
                         :
     vs.               :
                         :
CROSSMARK, INC., and the   :
DANNON COMPANY,         :
     Defendants         :

- - -

Philadelphia, Pennsylvania
Thursday, December 11, 2008

- - -

Deposition of JAMES POSTIGLIONE,

taken at the Marriott Courtyard Hotel at

Philadelphia Airport, 8900 Bartram Avenue, on

the above date, beginning at approximately

3:45 p.m., before Jessica Haddix, Registered

Professional Reporter and Notary Public.



4fc364d1-437e-42dc-befe-75a9cc6725d9

Page 2

1
2  APPEARANCES:
3    WAYNE D. BOZEMAN, ESQUIRE
       POWELL BOZEMAN
4       301 Joseph Drive
        West Chester, PA  19380
5
       Counsel for Plaintiffs
6
7  STEPHEN E. FOX, ESQUIRE
     FISH & RICHARDSON, P.C.
8       1717 Main Street
        Suite 5000
9    Dallas, TX  75201
10   Counsel for Defendants
11      - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25    (Index at end of transcript.)

Page 3

1
2        JAMES POSTIGLIONE, after having
3     been first duly sworn, was examined and
4     testified as follows:
5  BY MR. FOX:
6     Q.  Would you state your name for the
7  record, please?
8     A.  Yes.  James G. Postiglione.
9     Q.  Mr. Postiglione, my name is Steve
10 Fox.  We met before the deposition began.  I
11 think, as you know, I represent the two
12 defendants in this lawsuit, Crossmark and
13 Dannon, both of whom were sued by Kathleen
14 Johnston, Loretta Weigner, and Janice
15 Fahrenholtz.
16         Before we begin the formal
17 process of taking your deposition or the
18 substantive part of the deposition, can you
19 tell me whether or not you have ever been
20 deposed?
21         MR. BOZEMAN:  You have to
22     answer it.
23         THE WITNESS:  What is deposed?
24         MR. BOZEMAN:  Like this.
25 BY MR. FOX:

Page 4

1         James Postiglione
2     Q.  Like this where a lawyer asks you --
3     A.  No.
4     Q.  Do you understand this afternoon
5  that you're under oath?
6     A.  Yes.
7     Q.  You understand that you're
8  testifying to the truth to the best of your
9  ability?
10    A.  Right.
11    Q.  You understand that there are
12 penalties for perjury if it's learned that
13 your testimony is not truthful?
14    A.  Uh-huh.
15    Q.  Is that a yes?
16    A.  Yes.
17    Q.  The next ground rule that will make
18 things go more comfortably for us is, number
19 one, allow me to finish asking a question
20 before you begin to answer, and I will
21 likewise allow you to finish answering before
22 I pose a new question to you.
23    A.  Okay.
24    Q.  Also, if you please answer each of
25 the questions with a verbal response because

Page 5

1         James Postiglione
2  the court reporter is trying to record
3  accurately the conversation that we have, and
4  if we use nonverbal expressions, she won't be
5  able to record that accurately.
6         Is that acceptable?
7     A.  That's acceptable.
8     Q.  If you don't understand a question I
9  pose to you at any point during the
10 deposition, please ask me to repeat it or
11 rephrase it, and I will be happy to do so.
12    A.  Okay.
13    Q.  Can we agree that if you answer a
14 question during the deposition, that you
15 understood it at the time I posed it to you?
16    A.  Yes.
17    Q.  Are you represented in this
18 deposition today by the law firm of Powell
19 Bozeman?
20    A.  Yes.
21    Q.  Have you signed a document in which
22 you formally retained the Powell Bozeman law
23 firm?
24    A.  Yes.
25    Q.  Have you signed a consent form

Page 26

```
1              James Postiglione
2     Q.  Who?
3     A.  Brenda Holmes.
4     Q.  Did anybody else tell you that?
5     A.  Well, I mean, that's who I reported
6  to.
7     Q.  So, the answer is, no, just Brenda
8  Holmes?
9     A.  Brenda Holmes -- well, no.  The
10 company policy is no overtime.
11    Q.  I'm going to show you a document
12 that shows that that's not true; that the
13 company policy is that if you work more than
14 40 hours, you record all time worked, and
15 you're paid overtime.
16    A.  Okay.
17    Q.  So, this idea that the company
18 doesn't pay overtime, who told you that?
19    A.  That's what we were told.
20    Q.  By whom?
21    A.  By our company.
22    Q.  Who?
23    A.  Brenda Holmes.
24    Q.  Brenda Holmes worked on the
25 Land-o-Lakes --
```

Page 28

```
1              James Postiglione
2     Q.  One second, please.
3         You were told by Brenda Holmes
4  that you could only record for each day worked
5  20 minutes of admin time?
6     A.  Yes.
7     Q.  So, if I show you records that you
8  yourself created -- that is, the information
9  that you put in into the SalesTrak --
10 reflecting that you put in more than 20
11 minutes of admin time on specific days, how
12 are you going to be able to explain that?
13    A.  Well, whatever I put in is still
14 going to come out to 40 minutes -- I mean,
15 it's going to come out to 40 hours.
16    Q.  Well, but you're telling me that you
17 were instructed to only put down 20 minutes of
18 admin time per day, correct?
19    A.  Right.
20    Q.  So, if, in fact, you put down more
21 than 20 minutes of admin time --
22    A.  Some days you did put more than
23 20-minute admin time in.  You had no choice,
24 but you were only supposed to put 20-minute
25 admin time.
```

Page 27

```
1              James Postiglione
2     A.  She was our supervisor.  She was the
3  supervisor on the dedicated team.
4     Q.  Let me just make sure we get this
5  clearly into the record.
6         Brenda Holmes was a
7  Land-o-Lakes --
8     A.  No.  She was a Crossmark employee.
9     Q.  She worked on the Land-o-Lakes
10 dedicated team?
11    A.  Right.
12    Q.  Did Brenda Holmes have
13 responsibility for retail representatives on
14 any other team besides Land-o-Lakes?
15    A.  No, just Land-o-Lakes.
16    Q.  So, tell me what you claim she said
17 about recording administrative time.
18    A.  That we were only allowed 20
19 minutes.
20    Q.  20 minutes in the morning, and 20
21 minutes in the evening?
22    A.  20-minute admin time; that's it.
23    Q.  So, you were only supposed to record
24 20 minutes of admin time --
25    A.  Admin time.
```

Page 29

```
1              James Postiglione
2     Q.  Well, what is it?  Did you follow
3  your supervisor's instruction or didn't --
4     A.  Yes, I did.
5     Q.  You're telling me that some days you
6  didn't because some days you entered more than
7  20 minutes administrative time.
8     A.  I told you I put in 20-minute admin
9  time; that's what I'm saying, 20-minute admin
10 time.
11        (Exhibit D-8 marked for
12    identification.)
13 BY MR. FOX:
14    Q.  Mr. Postiglione, I am handing you
15 what I will represent to you is information
16 from SalesTrak.  As you can see, your name is
17 reflected on this particular piece of paper.
18        There is a column for activity
19 date, and then a column for hours spent
20 engaging in a particular activity, correct?
21    A.  Yes.
22    Q.  So, if you look down in the middle
23 of the page, August 13, 2008, do you see the
24 entry for admin time?
25    A.  Yes.
```

8 (Pages 26 to 29)

4fc364d1-437e-42dc-befe-75a9cc6725d9

Page 38

James Postiglione

2 devices?
3    A.  No.
4    Q.  How much time do you claim you were
5 underpaid each week as a result of this
6 alleged computer rounding error?
7    A.  I would say at least an hour and a
8 half a day easy.
9    Q.  Because of the computer rounding
10 error?
11    A.  No, because of the work that I did
12 that I didn't get paid for.
13    Q.  I'll get --
14    A.  Administrative time.
15    Q.  I'm going to get to that in a
16 minute.  I want to focus just on the computer
17 rounding error, this allegation that there was
18 a computer rounding error.
19        How much time do you claim you
20 were underpaid each day or each pay period --
21    A.  The five minutes.
22    Q.  So, that would be one minute a day?
23    A.  Exactly.
24    Q.  The amount of the alleged unpaid
25 time is minimal; that is because of this

Page 39

James Postiglione

2 computer rounding error?
3    A.  I guess, yes.
4    Q.  Let's focus on your allegations
5 about administrative time.  I asked you
6 earlier what duties you performed as a retail
7 representative, and with respect to -- I want
8 to focus on the administrative duties that you
9 performed, not the in-store duties.  You said
10 that you checked e-mails and you printed out
11 your projects.
12        Did you do anything else in the
13 morning by way of an administrative task?
14    A.  Well, that took enough time; that
15 took long to print out your projects, check
16 e-mails, and get everything ready for your
17 day.
18    Q.  How long did it take you to perform
19 those tasks in the morning?
20    A.  It depended on how many store calls
21 I had that day.
22    Q.  So, it varied each day?
23    A.  Yeah.  Well, I did a lot at night,
24 too.
25    Q.  We're not talking about night yet.

Page 40

James Postiglione

2 I want to focus just on the amount of time you
3 spent in the morning.
4    A.  It depended on how many store calls
5 I had, what I had to print out for the day.
6    Q.  Again, it's printing out the project
7 detail, and it's checking your e-mail?
8    A.  Right.
9    Q.  So, how long would that take on
10 average each morning?
11    A.  On average each morning, I would say
12 about 40 minutes.
13    Q.  Now, when you printed a document,
14 you went to your computer, you -- I suppose
15 you opened the document on your computer, and
16 then hit print?
17    A.  Well, yeah, but don't forget, I
18 had -- if I had 14 store calls that day, I had
19 to print out a copy for every project I had to
20 do.
21    Q.  But after opening up a document and
22 hitting print, you didn't have to do anything
23 else but go to the printer and retrieve the
24 piece of paper, correct?
25    A.  Yes.

Page 41

James Postiglione

2    Q.  Did you have a hand-held device that
3 you used?
4    A.  No.
5    Q.  So, it's your estimate that on
6 average it took you 40 minutes to check e-mail
7 and print out the project detail?
8    A.  Right.
9    Q.  With respect to the afternoon or the
10 end of the day, describe for me the
11 administrative tasks that you performed.
12    A.  Well, you had to put in all the
13 stuff that you reported that day, you had to
14 go home, open up your computer again, and
15 every project that you printed, you had to put
16 in the computer, you had to answer the
17 questions.
18        Don't forget, a lot of times
19 the computer would freeze.  You would be stuck
20 on the computer for a long time.
21    Q.  Now, when the computer froze on you,
22 was that your fault or the --
23    A.  No.
24    Q.  -- computer's?
25    A.  It's the system.  It's the Crossmark

11 (Pages 38 to 41)

4fc364d1-437e-42dc-befe-75a9cc6725d9

Page 42

1              James Postiglione
2    computer system.
3        Q.   So, it was never your computer's
4    fault?
5        A.   No.
6        Q.   So, other than inputting data into
7    the computer system, what other tasks did you
8    perform at the end of the day?
9        A.   It depended.  Sometimes we had to
10   download pictures, and then twice a month we
11   had to schedule our stores out, which means
12   that if I had 60 stores, I had to schedule
13   them out for each day for that whole 15 days,
14   whatever it was.
15             We used to schedule it out
16   twice a month.  So, that would take a lot of
17   time, because you would have to schedule your
18   stores out to your territory, where you were
19   going to go Monday, where you were going to go
20   Tuesday, where you were going to go Wednesday,
21   for three weeks.
22       Q.   That was twice a month?
23       A.   Twice a month.
24       Q.   How long did that activity take?
25       A.   A long time.

Page 43

1              James Postiglione
2        Q.   How long on average?
3        A.   I would say at least three hours.
4        Q.   Each time you performed this task of
5    scheduling stores --
6        A.   Yes.  Sorry.
7        Q.   Each time you performed the task of
8    scheduling stores, it took you three hours?
9        A.   Yes.
10       Q.   How long would it take you to input
11   data on those days that you were not
12   scheduling stores?
13       A.   To input data, at least an hour.
14       Q.   How often did you have to download
15   and transfer pictures?
16       A.   Four times a year.
17       Q.   So, that was a very infrequent
18   exercise, I take it?
19       A.   Yeah, four times a year.
20       Q.   Other than inputting data on a
21   regular basis, what other administrative tasks
22   did you perform at the end of the day?
23       A.   Well, basically, that's it.
24       Q.   Okay.  Now, do you have any personal
25   knowledge of what kind of administrative tasks

Page 44

1              James Postiglione
2    employees on teams other than the Land-o-Lakes
3    dedicated team perform at the beginning of
4    their workday?
5        A.   No.
6        Q.   Do you have any personal knowledge
7    of what kind of administrative task employees
8    on teams other than the Land-o-Lakes dedicated
9    team perform at the end of the workday?
10       A.   No.
11       Q.   When you began using SalesTrak, did
12   you obtain some training in order to know how
13   to use it?
14       A.   Yeah.
15       Q.   When you entered information into
16   SalesTrak, you used different categories for
17   reporting your time, correct?
18       A.   Yes.
19       Q.   One category would be in-store time?
20       A.   Right.
21       Q.   One category would be administrative
22   time?
23       A.   Yes.
24       Q.   One category might be driving time?
25       A.   Right.

Page 45

1              James Postiglione
2        Q.   Were there any other categories of
3    time?
4        A.   Well, training time.  Sometimes if
5    we had training, we had to put that in.
6        Q.   All right.  Did you understand while
7    working for Crossmark that it was the
8    company's policy that a retail representative
9    was supposed to accurately record in SalesTrak
10   all time spent performing administrative
11   tasks?
12       A.   Yes.
13       Q.   Did you understand that the retail
14   representative was not supposed to estimate
15   the amount of time that he or she spent
16   performing administrative tasks?
17       A.   Yes.
18       Q.   So, that is, the retail
19   representative was supposed to accurately
20   record the administrative time --
21       A.   Yes.
22       Q.   -- in SalesTrak?
23             Now, we talked just a little
24   earlier in the deposition about your
25   interaction with Brenda Holmes.

Page 50

1          James Postiglione
2          Then it goes on to say,
3  "Associates should NOT," and not is all
4  capitalized, "simply use a rule of thumb that
5  administrative time is about 15 or 30 minutes
6  per day.  Instead, associates are expected to
7  record actual administrative time worked."
8          Did I read that paragraph
9  correctly?
10     A.  Yes.
11     Q.  Did you understand that was
12  Crossmark's --
13     A.  Yes.
14     Q.  -- written policy?
15     A.  Yes.
16     Q.  So, I take it then, based upon your
17  answer, that you understood that if a retail
18  representative did not report all time spent
19  performing administrative tasks, that that
20  retail representative was violating company
21  policy?
22     A.  Yes.
23     Q.  Other than your conversation with
24  Miss Holmes, do you have any reason to believe
25  that it was not Crossmark's policy for retail

Page 51

1          James Postiglione
2  representatives to report all administrative
3  tasks performed at any time by the retail
4  representative as administrative time?
5     A.  Well, according to her, that was
6  Crossmark's policy.
7     Q.  But other than speaking with her, do
8  you have any other reason --
9     A.  Right.  No.
10     Q.  Do you have any personal knowledge
11  that any retail representative on the
12  Land-o-Lakes team, other than yourself, was
13  not following Crossmark's policy with respect
14  to reporting all administrative time worked?
15     A.  No.
16     Q.  Do you have any personal knowledge
17  that any retail representative on a team other
18  than the Land-o-Lakes dedicated team was not
19  following Crossmark's policy for reporting all
20  administrative time worked?
21     A.  No.
22     Q.  Do you have any personal knowledge
23  that any employees on teams other than the
24  Land-o-Lakes dedicated team were instructed
25  not to report all of their administrative time

Page 52

1          James Postiglione
2  worked?
3     A.  No.
4     Q.  Now, your claim that you were
5  instructed by Miss Holmes not to record more
6  than 20 minutes of administrative time per day
7  is unique to you, is it not?
8     A.  No.  I mean, that's what we were
9  told.
10     Q.  When you say --
11     A.  Our division.  Our unit.
12     Q.  That would be the Land-o-Lakes team?
13     A.  That would be our division.  Like,
14  Land-o-Lakes -- the Brenda Holmes' people that
15  worked under her besides me.
16     Q.  How much time do you claim that
17  Crossmark failed to pay you for administrative
18  tasks each day?
19     A.  Well, I would say at least two
20  hours, two to three hours a day.
21     Q.  Is it possible for you to -- I'm
22  sorry -- that would be two to three hours a
23  day, which would cover the administrative
24  tasks in the morning and the administrative
25  tasks in the evening?

Page 53

1          James Postiglione
2     A.  I am talking about a combined day.
3     Q.  Is it possible for you to tell me on
4  average how much of that time, the two or
5  three hours, was in the morning --
6     A.  No.
7     Q.  -- or how much was in the evening?
8     A.  Not really.  It varied.
9     Q.  Did you ever complain to anybody at
10  Crossmark about this alleged instruction you
11  got from Miss Holmes to not record --
12     A.  No.
13     Q.  -- more than 20 minutes
14  administrative time?
15     A.  No.
16     Q.  You also claim that Crossmark failed
17  to compensate you for the time you spent
18  driving from your home to your first work
19  location of the day, and driving from your
20  last work location to your home, correct?
21     A.  Yes.
22     Q.  In what territory did you work for
23  Crossmark's Land-o-Lakes team?
24     A.  Well, I had a big territory.
25     Q.  Okay.  Tell me about the territory.

Page 58

James Postiglione

1  40-hour week.
2
3           Basically, we're talking
4  here -- the bottom line is, you could have
5  never done the job -- to do the job right, you
6  had -- it was going to take you a lot more
7  time than you were supposed to do it.  Policy
8  or no policy, we worked for a broker company
9  that paid us to do the job.
10          In order to do the job right,
11 which is the way we did it, you exceeded the
12 time that you were supposed to because you had
13 to do the job right.
14          They expected you to stay in
15 the store for 30 minutes.  There is no way you
16 could do a store call in 30 minutes.  It's
17 impossible, not with the tasks we had; that's
18 what I'm saying.
19          It ain't about drive time, five
20 minutes.  It's about getting paid for the time
21 we spent over and beyond what we were supposed
22 to; that's the bottom line.
23     Q.  With respect to this idea that
24 you -- you understand, don't you, that as part
25 of this class action or collective action, the

Page 59

James Postiglione

1
2  only time you're asking to be paid for is
3  administrative time at the beginning and end
4  of the day, drive time at the beginning and
5  end of the day, and any computer error that
6  resulted in some time not equaling a full
7  hour, right?
8     A.  Yes.
9     Q.  So, you're not suing Crossmark in
10 this lawsuit for this idea that store calls
11 lasted more than 30 minutes a day --
12    A.  We're suing about hours, hours that
13 we were not paid for.
14    Q.  Okay.
15    A.  Whether we were told 20 minutes or
16 an hour.
17    Q.  Now, we can agree, can we not, that
18 your drive time was occasionally longer than
19 the drive time of other persons on the
20 Land-o-Lakes team?
21    A.  I don't know.  I don't know
22 everybody's territory.  I only know my
23 territory.
24    Q.  So, you're not here saying that you
25 know exactly the amount of time that other

Page 60

James Postiglione

1
2  Land-o-Lakes representatives drove to their
3  first place of business --
4     A.  No.
5     Q.  -- or drove from their last place of
6  business to home, correct?
7     A.  Yes.
8     Q.  You're not saying that?  That's a
9  terrible question.  Hang on.
10    A.  I don't know.
11    Q.  You're not here to say that you know
12 how much time any other Land-o-Lakes
13 representative took driving in the morning
14 from home to their first place of work?
15    A.  I don't know.  No.
16    Q.  You're not saying that you're here
17 to tell me or represent that you know how much
18 time other Land-o-Lakes representatives spent
19 driving from their last place of work to home?
20    A.  I don't know.
21    Q.  Okay.  Would the same be true with
22 respect to representatives on other teams?
23    A.  Yeah.  I don't know.
24    Q.  Let me make sure I have this right
25 from our earlier discussion.

Page 61

James Postiglione

1
2           When you drove from your first
3  work location to other stores, including the
4  last store location, you recorded the drive
5  time, did you not?
6     A.  Yeah, I recorded it, but it wasn't
7  right.
8     Q.  Do you recall receiving the
9  Crossmark full-time associate policy manual,
10 May of 2004, during your employment at the
11 company?
12    A.  Yeah.  Uh-huh.
13    Q.  Let me mark this as an exhibit.
14          (Exhibit D-9 marked for
15 identification.)
16 BY MR. FOX:
17    Q.  Let's look, first of all, at Exhibit
18 9; that's called Employment Acknowledgment.
19          Do you see the signature at the
20 bottom of the page?
21    A.  Yes.
22    Q.  Is that yours?
23    A.  Yes, it is.
24    Q.  So, this document reflects that you
25 received the document or the exhibit that

16  (Pages 58 to 61)

4fc364d1-437e-42dc-befe-75a9cc6725d9

Page 62

James Postiglione

2 we're now looking at, which is Exhibit 3, the
3 full-time associate policy manual?
4     A.  Yes.
5     Q.  So, if we look in the associate
6 manual concerning payment for drive time, on
7 Page 16 there is a heading, Travel Time/Drive
8 Time.
9         Do you see that?
10    A.  Yes.
11    Q.  It says, "Nonexempt associates are
12 on the clock once the associate arrives at the
13 first work location of the day and goes off
14 the clock once the associate leaves the last
15 work location of the day."
16        "Drive time between work
17 locations during the day is to be recorded as
18 time worked.  However, time spent on personal
19 stops between work locations is not considered
20 drive time."
21        "For retail associates certain
22 territories may require longer drive times to
23 the first work location of the day.  The
24 supervisor will determine if this applies to
25 the associate.  Pay for travel time worked is

Page 63

James Postiglione

2 included in the associate's project pay or
3 hourly rate."
4         Did you understand while
5 working for Crossmark that you were supposed
6 to accurately record the amount of drive time
7 that you spent driving between --
8     A.  Yes.
9     Q.  Just a second.
10        Did you understand while
11 working for Crossmark that you were supposed
12 to accurately record the amount of time that
13 you spent driving from your first work
14 location your last work location?
15    A.  Yes.
16    Q.  But you're telling me you didn't do
17 that?
18    A.  No.
19    Q.  No, you didn't do it?
20    A.  No, I didn't do it.
21    Q.  Did you ever complain to anybody at
22 Crossmark about the amount of drive time that
23 you were having to undertake?
24    A.  No.
25    Q.  Did you ever complain about not

Page 64

James Postiglione

2 being paid for drive time?
3     A.  No.
4     Q.  Did you ever tell anybody at
5 Crossmark that you were not accurately
6 recording your drive time?
7     A.  No.
8     Q.  What did you do when you left your
9 house and drove to the first work location,
10 other than simply drive the car?
11    A.  That's it.
12    Q.  Did you talk on the phone to any
13 sales associates or supervisors?
14    A.  No.
15    Q.  You didn't have a synch device or a
16 hand-held device.
17        So, I take it you didn't look
18 at one of those?
19    A.  No.
20    Q.  So, you didn't perform any tasks for
21 Crossmark in your car while you were driving.
22        You simply drove from your home
23 to your first work location?
24    A.  Yes.
25    Q.  At the end of the day, when you left

Page 65

James Postiglione

2 your last work location and drove home, did
3 you perform any tasks?
4     A.  No.
5     Q.  You simply drove the car?
6     A.  Yes.
7     Q.  Did Crossmark require you to
8 complete paperwork during your commute at the
9 beginning of the day or at the end of the day?
10    A.  Paperwork?
11    Q.  Did you have to complete paperwork
12 in the car during the commute?
13    A.  No.
14    Q.  You weren't required by Crossmark to
15 perform any duties during your commute at the
16 beginning of the day or at the end of the day,
17 correct?
18    A.  Just what we did in-store.
19    Q.  Right.  So, my question is this:
20 Crossmark didn't require you to complete any
21 duties while you were driving at the beginning
22 of the day?
23    A.  No.
24    Q.  No, they did not?
25    A.  No.

17 (Pages 62 to 65)

4fc364d1-437e-42dc-befe-75a9cc6725d9

Page 66

James Postiglione
1
2   Q.   Now --
3   A.   They did not.
4   Q.   And Crossmark didn't require you to
5   perform any duties during your commute at the
6   end of the workday, did it?
7   A.   Not while we were driving, no.
8   Q.   How much time are you claiming that
9   you're owed for the drive time at the
10  beginning of the day and at the end of the
11  day?
12  A.   I don't know.  I really can't answer
13  that.
14  Q.   As you sit here today, do you have
15  any estimate or any sense of the amount of
16  time that you say you have not been paid for
17  drive time at the beginning of the day or at
18  the end of the day?
19  A.   No, because it's combined.  I'm not
20  just talking about drive time.  I'm talking
21  about drive time and administrative time.
22  It's kind of combined.
23  Q.   But we can agree that you didn't
24  perform administrative tasks while you were
25  driving?

Page 67

James Postiglione
1
2   A.   No.
3   Q.   No, you did not?
4   A.   No, I did not.
5   Q.   Let's look at your Declaration,
6   which was Exhibit 7.
7        Do you still have that?
8   A.   Okay.
9   Q.   Look at the second page of that,
10  please.
11  A.   Right.
12  Q.   Under the heading, Administrative
13  Time, Paragraph 8.
14       Do you see that?
15  A.   Yes.
16  Q.   Never mind, Mr. Postiglione.
17       Can you tell me, sir, where you
18  were born?
19  A.   I was born in the United States.
20  Q.   Where?
21  A.   Philadelphia, Pennsylvania.
22  Q.   Where did you grow up?
23  A.   Philadelphia, Pennsylvania.
24  Q.   What is your current home address?
25  A.   2745 South 17th Street, Philadelphia

Page 68

James Postiglione
1
2   PA.
3   Q.   What's the ZIP code there?
4   A.   19145.
5   Q.   Are you currently working?
6   A.   Not at the moment.
7   Q.   Are you employed at the present
8   time?
9   A.   I will be getting employed, yes.
10  Q.   When?
11  A.   Probably next week.
12  Q.   But you're not working today?
13  A.   No.
14  Q.   Where are you going to work next
15  week?
16  A.   I'll be working for a company called
17  Acosta (ph.).
18  Q.   What will you be doing for Acosta?
19  A.   The same type of work that I am
20  doing for Crossmark.
21  Q.   That you did for Crossmark?
22  A.   Yes.
23  Q.   Will you work in the same territory?
24  A.   Basically, yes.
25  Q.   Did you graduate from high school?

Page 69

James Postiglione
1
2   A.   Yes -- no.  GED.
3   Q.   Did you attend college?
4   A.   No.
5   Q.   Have you ever served in the
6   military?
7   A.   No.
8   Q.   Are you married?
9   A.   Yes.
10  Q.   For how long have you been married?
11  A.   29 years.
12  Q.   Have you ever been involved in a
13  lawsuit before as a party?
14  A.   No.
15  Q.   Have you ever been involved in a
16  lawsuit before as a witness?
17  A.   No.
18  Q.   When did you obtain your position
19  with Acosta?
20  A.   Just recently.
21  Q.   When were you formally hired or
22  offered a position?
23  A.   This week.
24  Q.   This week?
25  A.   (Indicating.)

18  (Pages 66 to 69)

4fc364d1-437e-42dc-befe-75a9cc6725d9

Page 74

```
 1              James Postiglione
 2   BY MR. FOX:
 3       Q.  With respect to training time, that
 4   was a separate category from administrative
 5   time, correct?
 6       A.  Yes.
 7       Q.  So, the four buckets of time, I take
 8   it, were in-store time, administrative time,
 9   driving time --
10       A.  And training time.
11       Q.  -- and training time.
12           Were there any other buckets of
13   time?
14       A.  No.  Just basically those four.
15       Q.  So, when you met with your
16   supervisor from time to time, you recorded the
17   meeting time or time spent in those meetings
18   as training?
19       A.  Training.
20       Q.  The only time you recorded as
21   administrative time was time you spent in the
22   morning or the evening doing different tasks?
23       A.  Right.
24           MR. FOX:  I don't have anything
25   else at this time.
```

Page 75

```
 1              James Postiglione
 2           MR. BOZEMAN:  Just one other
 3   question.
 4   BY MR. BOZEMAN:
 5       Q.  Do you recall your supervisor ever
 6   instructing you to perform administrative
 7   tasks and instructing you to record those for
 8   pay purposes -- excuse me.
 9       A.  Well, basically, like I said, you
10   know, we were told 20-minute admin time;
11   that's basically what, you know, I recall.
12   So, whatever we did over and beyond that was
13   on our time.
14       Q.  Okay.
15           MR. BOZEMAN:  No other
16   questions.
17           MR. FOX:  I think we're
18   finished with your deposition for now,
19   Mr. Postiglione.  Thank you.
20           THE WITNESS:  Thank you.
21           (Witness was excused.)
22           (Deposition concluded at 5:05
23   p.m.)
24
25
```

Page 76

```
 1
 2               I N D E X
 3   WITNESS NAME                   PAGE
 4   James Postiglione
 5       By Mr. Fox         3
 6       By Mr. Bozeman     70
 7
 8             - - -
 9           E X H I B I T S
10
11   NO.     DESCRIPTION          PAGE
12   Exhibit D-7    Affirmation of James    20
                    Postiglione
13
     Exhibit D-8    SalesTrak Information    29
14
     Exhibit D-9    Employment Acknowledgement   61
15
16             - - -
17
18
19
20
21
22
23
24
25
```

Page 77

```
 1
 2           I have read the foregoing transcript
 3   of my deposition given on December 11, 2008,
 4   and it is true, correct and complete, to the
 5   best of my knowledge, recollection and belief,
 6   except for the corrections noted hereon and/or
 7   list of corrections, if any, attached on a
 8   separate sheet herewith.
 9
10
11           _____
11           James Postiglione
12
13
14
15   Subscribed and sworn to
16   before me this _____ day
17   of _____, 20__
18
19
20   _____
21   Notary Public
22
23
24
25
```

Page 78

```
 1
 2          C E R T I F I C A T E
 3          I HEREBY CERTIFY that the
 4    proceedings, evidence and objections are
 5    contained fully and accurately in the
 6    stenographic notes taken by me upon the
 7    deposition of JAMES POSTIGLIONE, taken on
 8    December 11, 2008, and that this is a true and
 9    correct transcript of same.
10
11
12
13
14          _____
15          Jessica Haddix, Registered
            Professional Reporter and
16          Notary Public
17
18
19
20          (The foregoing certification of this
21    transcript does not apply to any reproduction
22    of the same by any means, unless under the
23    direct control and/or supervision of the
24    certifying reporter.)
25
```

Page 79

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5       1. To clarify the record.
 6       2. To conform to the facts.
 7       3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25
```

**IMPORTANT NOTIFICATION TO POTENTIAL CLASS MEMBERS**

TO:  **ALL CURRENT OR FORMER EMPLOYEES OF CROSSMARK, INC., WHO HAVE BEEN OR CURRENTLY ARE EMPLOYED AS FULL-TIME OR PART-TIME RETAIL REPRESENTATIVES AT ANY TIME SINCE JANUARY 1, 2006.**

FROM:  **POWELL BOZEMAN, P.A.**

RE:  **RIGHT TO JOIN A LAWSUIT SEEKING TO RECOVER UNPAID COMPENSATION**

DATE:  _____, 2009

## 1.   PURPOSE OF NOTICE

The purpose of this Notification is to inform you of the existence of a collective action lawsuit in which you may be eligible to participate because you may be "similarly situated" to the named Plaintiffs.  This Notification is also intended to advise you how your rights under the federal Fair Labor Standards Act (the "Act") may be affected by this lawsuit, and to instruct you on the procedure for participating in this lawsuit, should you decide that it is appropriate and you choose to do so.

This Notification is also intended to inform you that, if you choose to join this lawsuit, you will designate the named Plaintiffs as your agents to make decisions on your behalf concerning (i) the litigation, (ii) the method and manner of conducting this litigation, (iii) the entering of an agreement with Plaintiffs' counsel concerning fees and costs, and (iv) all other matters pertaining to this lawsuit.  The decisions and agreements made and entered into by the named Plaintiffs will be binding on you if you join this lawsuit.

This Notification is also intended to inform you that the court has not made any ruling yet as to whether you are or are not entitled to any overtime compensation.  That issue has yet to be determined, and is vigorously contested by CROSSMARK.  Moreover, the court has not determined or required the application of any specific formula for determining how much, if any, compensation you may be entitled to receive.

## 2.   DESCRIPTION OF THE LAWSUIT

A lawsuit has been brought by Kathleen Johnston, Loretta Weigner, and Janice Fahrenholtz (the "named Plaintiffs") against CROSSMARK in the Unites States District Court for the District of New Jersey as Cause No. 08-1525 (SDW).  The lawsuit alleges that CROSSMARK failed to provide compensation as required by the Act.

Plaintiffs' lead counsel are:

Ralph A. Powell and Wayne D. Bozeman
POWELL BOZEMAN, P.A.
1900 Knight Circle
Yardley, PA 19067
Telephone:  (215) 439-7781
Facsimile:  (484) 887-8475

Generally, the overtime provisions of the Act require that, for all hours over forty hours per week that an employee works, the employer must compensate the employee at the rate of one and one-half times his or her regular hourly rate, unless that employee is properly classified as "exempt" from the overtime provisions of the Act.  The named Plaintiffs claim that during one or more weeks of their employment with CROSSMARK, they worked in excess of forty hours, but were not paid the overtime at the rate of one and one-half times their hourly rate for the hours they worked in excess of forty.  Specifically, the named Plaintiffs allege that from January 2006 until September 2008, a problem with CROSSMARK's computer system caused pay shortages for Retail Representatives.  Plaintiffs are suing to recover unpaid overtime compensation for the period from January 1, 2006 until September 1, 2008.



CROSSMARK vigorously denies the Plaintiffs' allegations, and maintains that its compensation policies and practices fully comply with the FLSA.

**3.      COMPOSITION OF THE CLASS**

The named Plaintiffs seek to sue on behalf of themselves and also on behalf of other employees with whom they are similarly situated. Those individuals that the named Plaintiffs allege are similarly situated are current and former employees of CROSSMARK who have been and/or currently are employed as full-time or part-time regular Retail Representatives at any time since January 1, 2006.

This Notification is only for the purpose of determining the identity of those persons who wish to be involved in this case and has no other purpose. Your right to participate in this suit will depend upon a later decision by the United States District Court that you and the representative Plaintiffs are actually "similarly situated."

**4.      YOUR RIGHT TO PARTICIPATE IN THIS LAWSUIT**

If you fit the definition above, that is, you were or currently are employed by CROSSMARK as a full-time or part-time regular Retail Representative at any time from January 1, 2006, you may have a right to participate in this lawsuit.

You may file a consent form to seek to participate in this lawsuit even if you did or did not keep records of your hours worked.

**5.      HOW TO PARTICIPATE IN THIS LAWSUIT**

Enclosed you will find a form entitled "Notice of Consent" ("Consent Form"). If you choose to join this lawsuit and, thus, participate in any recovery that may result from this lawsuit, **it is extremely important that you read, sign and return the Consent Form.**

The signed Consent Form must be postmarked by **[DATE]**. If your signed Consent Form is not postmarked by **[DATE]**, you will not participate in any recovery obtained against CROSSMARK in this lawsuit. If you have any questions about filling out or sending in the Consent Form, please contact Plaintiffs' counsel listed on page one of this Notice.

**6.      EFFECT OF JOINING THIS SUIT; NO RETALIATION PERMITTED**

If you choose to join in this lawsuit, you will be bound by the judgment, whether it is favorable or unfavorable. You will also be bound by, and will share in, any settlement that may be reached on behalf of this class.

If you choose to join this lawsuit, you may be required to (1) appear for a deposition in; (2) respond to written discovery; and/or (3) appear at a trial in Newark, New Jersey.

The named Plaintiffs in this matter have entered into a contingency fee agreement with Plaintiffs' counsel, which means that if there is no recovery, there will be no attorney fees or costs chargeable to you. If there is a recovery, however, Plaintiffs' counsel will receive part of any settlement obtained or money judgment entered in favor of all members of the class.

You may request a copy of the contingency fee agreement executed by the named Plaintiffs in this matter from Plaintiffs' counsel at the address, telephone number, or facsimile number that appears on page one of this notice.

It is a violation of Federal law for CROSSMARK to discharge, or in any manner discriminate or retaliate against you for taking part in this case. If you believe that you have been penalized, discriminated against or disciplined in any ways as a result of your receiving this notification, considering whether to join this lawsuit or actually joining this lawsuit, you should contact Plaintiffs' counsel immediately.

**7.      NO LEGAL EFFECT IN NOT JOINING THIS LAWSUIT**

If you choose not join this lawsuit, you will not be affected by any judgment or settlement rendered in this case, whether favorable or unfavorable to the class.  You will not be entitled to share any amounts recovered by the class. You will be free to file your own lawsuit, subject to any defenses that might be asserted.  The pendency of this lawsuit will not stop running of the statute of the limitations as to any claims you might have until you opt-in to it.

**8.      FURTHER INFORMATION**

Further information about this Notification or the lawsuit may be obtained from Plaintiffs' counsel at the address, telephone number, or facsimile number identified on page one of this Notice.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

KATHLEEN JOHNSTON, LORETTA :
WEIGNER, and JANICE :  Civil Action No. 08-1525 (SDW)
FAHRENHOLTZ, on behalf of themselves :
and all others similarly-situated, :
 :
  Plaintiffs, :
 :
  v. :
 :
 :
CROSSMARK, INC., and THE DANNON :
COMPANY, INC., :
 :
  Defendants. :

## CONSENT TO JOIN

  I WANT TO JOIN THIS LAWSUIT. I hereby authorize the prosecution of this Fair Labor Standards Act action in my name and on my behalf by Kathleen Johnston, Loretta Weigner, and Janice Fahrenholtz, the "Representative Plaintiffs." I designate these Representative Plaintiffs as my agents to make decisions on my behalf concerning this litigation, including the method and manner of conducting the litigation, the entering of an agreement with their counsel concerning attorney's fees and costs, and all other matters pertaining to the lawsuit.

  I understand that the Representative Plaintiffs have entered into a contingency fee agreement with the law office of Powell Bozeman, P.A. that applies to all plaintiffs who join this lawsuit. I understand that I may obtain a copy of the contingency fee agreement on request. By choosing to join this lawsuit, I agree to be bound by the contingency fee agreement.

  By choosing to join this lawsuit, I understand that I will be bound by the judgment, whether it is favorable or unfavorable. I also understand that I will be bound by, and will share in, any settlement that may be negotiated on behalf of all plaintiffs and approved by the Court.

  I acknowledge and understand that if I had chosen not to join this lawsuit, I would not be affected by any judgment rendered or settlement reached in this lawsuit, whether favorable or unfavorable

  I hereby consent to join this lawsuit.

_____  _____
Signature             Date

EXHIBIT
"9"
tabbies

**PLEASE PRINT OR TYPE THE FOLLOWING INFORMATION:**

Full Legal Name:_____

Any Other Name Used or Known By:_____

Mailing Address:_____

City, State, and Zip Code:_____

Daytime Telephone:_____

Evening Telephone (optional):_____

Cellular Telephone (optional):_____

E-mail Address (optional):_____